Darrell HAIRE *v.* STATE of Arkansas

CR 98-1438                                    8 S.W.3d 468

Supreme Court of Arkansas
Opinion delivered January 6, 2000

*James Law Firm*, by: *William Owen James, Jr., Kimberly D. Webb*, and *Steven R. McNeely*, for appellant.

*Mark Pryor*, Att'y Gen., by: *Vada Berger*, Asst. Att'y Gen., for appellee.

ROBERT L. BROWN, Justice. Appellant Darrell Haire appeals his judgment of conviction for capital murder and attempted aggravated robbery. He was sentenced to life imprisonment without parole and fifty years, with the fifty years to run consecutively with the life term. His grounds for appeal are: (1) insufficient evidence when the hearsay statements of Brodrick Jones are excluded; (2) error by the trial court in admitting evidence of prior bad acts; and (3) a discovery violation by the State in failing to disclose a leniency agreement with a State witness. We hold that none of these issues has merit, and we affirm.

The evidence at trial disclosed the following scenario. On February 11, 1996, Haire and Brodrick Jones were together in a white car and pulled into a Texaco Service Station on Highway 10 west of Little Rock. At the time, the Texaco employee, Janice Johnson, was at the station alone and outside by the gas pumps

picking up the trash. She asked the passenger in the car whether he wanted gas. The passenger, whom Johnson identified as Brodrick Jones, said "no" but asked if there was food in the store which was part of the service station complex. Jones followed Johnson into the store, and he asked to buy beer, which Johnson refused to sell him because it was Sunday. She also told him that the Subway outlet "right down the street" had "better food." Jones persisted about buying beer. Johnson testified: "And I kept saying, no. And he had his hands in his pocket, it's like a pouch in his coat, and I started getting nervous."

Johnson then told Jones that she would check with the manager in the back. She knew the manager was not on the premises, but she came back and told Jones that the manager said beer could not be sold. She added that there was a surveillance camera and "you're not going to get out of here without getting on the camera." The driver, whom Johnson identified as Haire, then came inside and asked what was taking so long. Jones answered "[T]here's nothing here for us. Let's go." Jones walked over to Haire and whispered something. Then they left. This occurred at about 1:15 p.m.

At approximately 11:33 p.m. on that same evening, Moses Waiters received a telephone call from Letitia Rummel, with whom he shared an apartment in Little Rock and whom he was engaged to marry. Rummel worked at the Subway store at the Riverdale Shopping Center on Cantrell Road. Rummel told Waiters that a man named Brodrick wanted to speak to him. Waiters knew Brodrick by the name of Sean and testified that Jones asked him "to set up a robbery of the store for him." Waiters begged off saying that there was not enough money and Rummel was asthmatic and might get hurt. Jones then asked about free sandwiches, and Waiters agreed to talk to Rummel. When he did so, he told her to push the robbery button and call the police. Waiters testified that Jones kept saying "we," and he asked Rummel if anyone else was there. At that point, she described another man coming through the door. Immediately after that, she responded that there was "a guy standing there with a gun to my head." Next, Waiters heard a struggle for the telephone, and the telephone was hung up. Waiters called 911 about what had happened. At 11:56 p.m. that same night, homicide detective Steve Moore of the Little Rock Police Department found

Rummel, who had been killed by a single gunshot wound to the head.

Cynthia Polk, the ex-wife of Jones, testified at trial that between midnight on February 11, 1996, and one o'clock the morning of February 12, 1996, Jones and Haire came to her house in Little Rock in a white car. Polk stated that Jones told her that Haire had shot somebody. Haire did not deny the allegation. When Polk asked what they got, Haire answered: "We didn't even get a cookie." When asked why he shot the woman, Haire said: "I don't know." Haire left after about five minutes. Jones spent the night at Polk's house. Polk told the jury that she had been convicted of burglary and theft by receiving and her parole had been revoked due to a positive drug test. She further admitted that she had two additional charges currently pending against her. She testified that the prosecutor had not attempted to sway her testimony.

The jury found Haire guilty of capital murder and attempted aggravated robbery, and he was sentenced accordingly. Following entry of the judgment and commitment order, Haire moved for a new trial on the basis that after the trial the prosecutor had dropped the two charges against Polk, which were felon in possession of a firearm and cocaine possession. According to Haire's motion, had the jury known that by testifying Polk was avoiding a mandatory prison sentence, it would have discounted her testimony. The motion was deemed denied because the trial court did not rule on it within thirty days. The trial court, however, subsequently denied the motion in writing and stated that both the State and defense counsel had inquired about the charges pending against Polk at trial and that *nolle prossing* those charges posttrial did not entitle Haire to a new trial.

### I. Hearsay Testimony

Haire first contends on appeal that the trial court erred in denying his motion *in limine* to exclude Waiters's testimony concerning Jones's statements made to him. This was inadmissible hearsay, according to Haire, and without this testimony, he claims that the evidence for conviction was insufficient. We conclude that the testimony was properly allowed and that no error was committed by the trial court.

The crux of Haire's hearsay argument is that there was no independent evidence of a conspiracy other than Jones's statements to Waiters, which Waiters related to the jury at trial. Haire accurately points out that statements by a co-conspirator in furtherance of a conspiracy are not hearsay. *See* Ark. R. Evid. 801(d)(2)(v). He argues, however, that a conspiracy cannot be proved solely by the hearsay statements sought to be excluded. Rather, he contends, the State must prove the conspiracy by independent evidence.

The trial court admitted Jones's statements to Waiters for two reasons. He found them to be statements of a co-conspirator which are admissible under Rule 801(d)(2)(v) but also statements which fell within the hearsay exception for a declarant's existing state of mind. *See* Ark. R. Evid. 803(3). The trial court was correct on both counts. The State met its burden of proving a conspiracy by Jones's statements to Waiters which were corroborated by independent evidence, including the testimony of Cynthia Polk and Janice Johnson. *See Bourjaily v. United States*, 483 U.S. 171 (1987); Ark. R. Evid. 104(a). When asked by Cynthia Polk what Haire and Jones "got" from the Subway outlet, Haire answered: "*We* didn't even get a cookie." Moreover, Janice Johnson testified that at the Texaco station Jones persisted in asking for beer, and he was fidgety with his hands in the pouch of his coat which made her nervous. She told him that the manager was in the back and that she could not sell the beer because the security cameras were everywhere and they would pick up the transaction. When Haire came into the store, the two men whispered and left. The jury could have reasonably inferred from this rendition of the events that the two men were exploring the possibility of robbing the Texaco station.

In addition, Jones's statements to Waiters were unquestionably probative of his existing state of mind which the State contended was an intent to commit robbery. The statements, therefore, fell within the hearsay exception set out under Rule 803(3).

## II. Prior Bad Act

Haire next claims that it was error for the trial court to admit the testimony of Janice Johnson, which, he maintains, was for the purpose of proving a prior bad act by Haire in contravention of Ark. R. Evid. 404(b). He also cites us to Ark. R. Evid. 403, but he

does not develop the Rule 403 argument on appeal. Nor did he do so before the trial court. We will not consider an argument that has not been properly developed. *See Munnerlyn v. State*, 292 Ark. 467, 730 S.W.2d 895 (1987).

■ Turning then to his Rule 404(b) argument, Haire admits that an exception to bad character evidence exists to prove the motive, plan, and intent of the perpetrator. He contends, however, that those prior acts must exhibit the same or a strikingly similar methodology, which is one so unique that only one person could have perpetrated both the prior act and the present crime. We disagree. Haire has cited the test for proving *modus operandi*. That test is different from the proof required for a Rule 404(b) exception such as intent. *See Diffee v. State*, 391 Ark. 669, 894 S.W.2d 564 (1995) (both *modus operandi* and proof of intent as an exception under Rule 404(b) were examined and discussed). Simply stated, proof of *modus operandi* is not the same as proof of a Rule 404(b) exception to other bad acts. The two evidentiary concepts are different.

■ The test for establishing motive, intent, or plan as a Rule 404(b) exception is whether the evidence of the other act has independent relevance. *Bragg v. State*, 328 Ark. 613, 946 S.W.2d 654 (1997). Evidence is indisputably relevant if it proves a material point and is not introduced solely to prove that the defendant is a bad person. *Hernandez v. State*, 331 Ark. 301, 962 S.W.2d 756 (1998). The decision to admit evidence under a Rule 404(b) exception is discretionary with the trial court. *Bragg v. State, supra.*

■■ The intent to commit a crime is a state of mind that is not ordinarily capable of proof by direct evidence, and so it must be inferred from circumstances. *Gillie v. State*, 305 Ark. 296, 808 S.W.2d 320 (1991). As has already been discussed in this opinion, the actions of Jones and Haire at the Texaco station could reasonably have been construed by the jury as evidence of surveillance with intent to rob, especially when the men's actions are coupled with what transpired at the Subway store only minutes later. We conclude that there was no abuse of discretion in admitting this circumstantial evidence of intent to rob. *See Weaver v. State*, 324 Ark. 290, 920 S.W.2d 491 (1996).

### III. Failure to Disclose a Prior Agreement

■ For his final point, Haire contends that the prosecutor dropped the charges against Cynthia Polk two weeks after her testimony at his trial, thus evidencing a prior agreement of leniency for testimony. He directs our attention to *Giglio v. United States*, 405 U.S. 150 (1972), where the Court held that any agreement of leniency for testimony must be disclosed to the defense prior to trial. Otherwise, the defendant's due process rights are violated.

■ In the instant case, there was no proof that such an agreement was made by the prosecutor with Polk. She testified that there was no agreement, and nothing was offered by Haire to counter that. The mere fact, standing alone, that the charges were dropped after the trial does not establish a *Giglio* violation. *See, e.g., United States v. Ramirez*, 608 F.2d 1261 (9th Cir. 1979) (fact that witness for government pled guilty to lesser offense three days after trial not enough to establish a prior agreement). Furthermore, as the trial court noted, the fact that Polk had charges pending against her at the time of her testimony was explored by both the State and the defense in questions before the jury. Haire has failed to exhibit reversible error on this point.

### IV. Rule 4-3(h)

The record has been examined for other reversible error pursuant to Ark. Sup. Ct. R. 4-3(h), and none has been found.

Affirmed.

SMITH, J., not participating.