Glenda Buryl DYER *v.* STATE of Arkansas

CR 00-500 36 S.W.3d 724

Supreme Court of Arkansas
Opinion delivered January 25, 2001
[Petition for rehearing denied March 1, 2001.]

*Paul E. Revels*, for appellant.

*Mark Pryor*, Att'y Gen., by: *James R. Gowen, Jr.*, Ass't Att'y Gen., for appellee.

DONALD L. CORBIN, Justice. On the evening of December 4, 1998, William "Bill" Dyer was found dead on his driveway in Horatio, Arkansas. He had been shot through the neck with a high-powered rifle. The investigation of the crime led police to suspect that Dyer was shot with his own 30/30 rifle by Steven Swim, a man who worked with Dyer's wife, Appellant Glenda Buryl Dyer. Police also suspected that Appellant had solicited Swim to kill her husband. Before police could make an arrest, however, Swim committed suicide by a single shotgun blast to his chest. Police subsequently arrested Appellant for the murder. Appellant was convicted in the Pike County Circuit Court of first-degree murder and sentenced to life imprisonment. On appeal, Appellant argues that the trial court erred by (1) admitting statements made by a coconspirator, under Ark. R. Evid. 801(d)(2)(v); (2) denying her motion for continuance to obtain an independent mental evaluation; and (3) admitting testimony from six witnesses concerning prior threats made by Appellant. Our jurisdiction of this appeal is pursuant to Ark. Sup. Ct. R. 1-2(a)(2). We find no error and affirm.

### I. Statements of Coconspirator

For her first point for reversal, Appellant argues that the trial court erred in admitting testimony from Steven Swim's wife, Silvia Swim, and her son, David Swim, concerning statements that Steven made to them. Collectively, Steven told them that a blonde woman in her forties would bring them some money, $10,000 to $15,000, as payment for Swim's role as a hit man. The trial court allowed the statements under Rule 801(d)(2)(v), as being statements by a coconspirator made in the course of and in furtherance of the conspiracy. Appellant challenges the trial court's findings that (1) Appellant and Swim were involved in a conspiracy to kill Bill Dyer,

and (2) the statements were made by Swim in furtherance of the conspiracy.

 Rule 801(d)(2)(v) provides that a statement is not hearsay if it is offered against a party and it is a statement by a coconspirator of a party made during the course and in furtherance of the conspiracy. Before such statements can be admitted, the State must make a prima facie showing that a conspiracy existed between the declarant and the defendant.[1] *See Spears v. State*, 321 Ark. 504, 905 S.W.2d 828 (1995); *Dixon v. State*, 310 Ark. 460, 839 S.W.2d 173 (1992); *Smithey v. State*, 269 Ark. 538, 602 S.W.2d 676 (1980). The statements themselves may be considered along with other independent evidence in determining the existence of a conspiracy. *Haire v. State*, 340 Ark. 11, 8 S.W.3d 468 (2000) (citing *Bourjaily*, 483 U.S. 171). The sufficiency of the evidence of a conspiracy is a preliminary matter decided by the trial court. *Spears*, 321 Ark. 504, 905 S.W.2d 828. As with any other evidentiary matter, we will not reverse the trial court's ruling absent an abuse of discretion. *Gaines v. State*, 340 Ark. 99, 8 S.W.3d 547 (2000).

In the present case, the trial court found that the State had made a prima facie showing that a conspiracy to kill Bill Dyer existed between Appellant and Steven Swim. The State presented evidence that Appellant and Swim worked together at the Regional Care Facility (RCF) in DeQueen. Appellant was Swim's supervisor. About one month prior to the murder, Debbie Hibbs, a coworker who was also Swim's girlfriend, overheard Appellant say to Swim that she wished she knew someone that could kill her husband; Swim replied that he might know somebody that could help her, and then just kind of laughed. Appellant made numerous other threats and statements regarding her desire to be rid of her husband. For instance, Appellant had previously made inquiries about killing her husband with poison, so that his death could not be traced to her. She also made the statement that the only way she could get out of her marriage was if her husband were dead.

Medical evidence showed that Bill Dyer had been killed by a high-powered rifle shot to the neck. Investigation of the scene

---

[1] Our rule is based upon Federal Rule of Evidence 801(d)(2)(E). Under the federal cases interpreting the federal rule, the existence of a conspiracy must be shown by a preponderance of the evidence. *See Bourjaily v. United States*, 483 U.S. 171 (1987); *United States v. Cordova*, 157 F.3d 587 (8th Cir. 1998).

revealed that the fatal shot was likely fired from inside an old farmhouse situated on the Dyers' property. Police found a bullet hole in the screen of the farmhouse window and an expended shell casing nearby. Less than two months prior to his murder, Dyer discovered that one of his rifles, a 30/30 caliber Winchester hunting rifle, was missing. David Swim testified that Steven Swim was not a hunter and did not own a gun. About one month prior to Dyer's murder, however, Steven Swim somehow obtained possession of Dyer's missing rifle. Jason Hibbs testified that sometime in late October or early November 1998, he discovered a 30/30 hunting rifle in Swim's tool box. Jason took the gun hunting and also fired it in his father's backyard. Shell casings recovered from that location were given to police. The police, in turn, sent them to the state crime laboratory to be compared against the shell casing found at the crime scene and some casings found in the victim's gun cabinet. Ballistics testing revealed that all of those shell casings were fired from the same gun.

The month before the murder, right around the time that he obtained possession of Dyer's 30/30 rifle, Steven Swim told his wife, Silvia, not to worry about money, because there is a woman in her forties that will "bring you some money," about $15,000. When Silvia asked why, Swim told her that whatever happened, she would hear about it on the radio. Similarly, Swim told his stepson, David, that a blonde lady in her forties would bring them a bag of money, $10,000 to $15,000. When David asked why, Swim told him it was for "being a hit man." Prior to his suicide, Swim told his wife that the woman in her forties was Appellant.

On the date of the murder, Appellant was working at the RCF with Swim. Late in the afternoon, Appellant left work for the purpose of retrieving Christmas decorations from her house to bring back to the RCF. Around 3:15 or 3:20 p.m., Appellant was seen at DeQueen High School, talking to her husband, who was a teacher there. Two students observed Appellant in her white Ford pickup truck near the school parking lot. Inside the truck, slumping down in the passenger's seat, was a man who appeared to be trying to hide his identity. The man had facial hair and was wearing a black leather jacket. Other evidence showed that Swim had facial hair and wore a black leather jacket.

Between 4:10 and 4:15 that same afternoon, a witness saw Appellant driving her white Ford pickup truck toward her house in

Horatio. Around the same time, Appellant's neighbor observed a white Ford truck of the same make and model as Appellant's driving in the direction of her residence. The neighbor heard a gunshot a short time later, and then saw the white Ford truck drive away from the residence.

During this same time, coworkers noticed that both Appellant and Swim were absent from the RCF. Additionally, Swim's wife telephoned the RCF looking for Swim around 4:00 p.m., but he was not there. Both Appellant and Swim returned to the RCF later that afternoon. Dyer's body was discovered by his daughter, Kelli, around 6:00 p.m. Kelli then called Appellant at work and told her that something was wrong with her dad. Kelli did not tell Appellant that Dyer was dead; however, upon receiving the call, Appellant became hysterical and began screaming, "He's dead, he's dead."

On February 1, 1999, around the time that the police investigation began to focus on him, Steven Swim attempted suicide by drug overdose. One month later, on March 3, 1999, Swim was scheduled to take a polygraph examination regarding Dyer's murder; he never showed. The next day, Swim's body was discovered in a concrete culvert near his home. Swim left a note to his wife, saying that he could not take the pressure anymore. According to the medical examiner, the official cause of his death was suicide by a single shotgun blast to the chest.

After his suicide, Kelli Dyer began to suspect that Appellant had put Swim up to committing the murder. As a result, she began to prod Appellant about her role in the murder. One day, in front of her two sisters and her aunt, Kelli asked Appellant "How did you get Steven to kill our dad?" Appellant did not deny playing a part in her husband's murder. Instead, she rather calmly responded that she did not do anything that her daughters did not want done before.

After Swim's suicide, his wife, Silvia, went to the police and told them about the statements that Swim had made to her and David regarding the money that Appellant would bring to them. At the direction of the police, Silvia had conversations with Appellant, on the telephone and in person, about the money. During one of those conversations, Silvia informed Appellant that her son, David, knows everything about the murder. According to Silvia, Appellant became very upset and said "David knows?" Appellant then assured

Silvia that she would give her money, but that she could not get the insurance money until her name was cleared. Appellant told Silvia in no uncertain terms: "If I go down, there is no money." Other evidence showed that Bill Dyer was insured for over $200,000, and that Appellant was the primary beneficiary of the policies. Additionally, at the time of trial, Appellant was receiving Dyer's retirement pay, which was approximately $1,680 per month.

In light of the foregoing evidence, we conclude that the trial court did not err in finding that there was *prima facie* evidence of a conspiracy between Appellant and Swim to kill Bill Dyer. We conclude further that the statements made by Swim to his wife and son were made during the course and in furtherance of the conspiracy. In the first place, the statements were made during the course of the conspiracy, as they were made prior to Dyer's death, sometime during November 1998. This is near the time that Swim obtained possession of Dyer's rifle and was overheard talking to Appellant about killing her husband.

In the second place, the statements were made in furtherance of the conspiracy. Although this court has had few opportunities to discuss the "in furtherance of" element of Rule 801(d)(2)(v), it has held that statements designed to further the specific objective of the conspiracy are made in furtherance of the conspiracy. *Dixon*, 310 Ark. 460, 839 S.W.2d 173. Federal cases interpreting the corresponding federal rule of evidence hold that this requirement should be interpreted broadly. *See Cordova*, 157 F.3d 587; *United States v. Edwards*, 994 F.2d 417 (8th Cir. 1993). Thus, statements that have an overall effect of facilitating the conspiracy or that somehow advance the objectives of the conspiracy are said to be in furtherance of the conspiracy. *Id.*; *United States v. Garcia*, 893 F.2d 188 (8th Cir. 1990). Statements that identify a fellow conspirator are also considered to be in furtherance of the conspiracy. *Id.* (citing *United States v. Handy*, 668 F.2d 407 (8th Cir. 1982)). Moreover, statements that are designed to enlist a third party's assistance or to induce the listener's aid in achieving some objective of the conspiracy meet the "in furtherance of" requirement. *Id.* (citing *United States v. Bentley*, 706 F.2d 1498 (8th Cir. 1983), *cert. denied*, 467 U.S. 1209 (1984)).

Appellant relies heavily on the case of *Leach v. State*, 38 Ark. App. 117, 831 S.W.2d 615 (1992), in which the court of appeals held that statements made by a coconspirator to his wife, who was

not part of the conspiracy, were not admissible under Rule 801(d)(2)(v). *Leach* relied primarily on two federal cases, *United States v. Wood*, 834 F.2d 1382 (8th Cir. 1987), and *United States v. Eubanks*, 591 F.2d 513 (9th Cir. 1979). Those cases held that statements made by a coconspirator to his wife were not made in furtherance of the conspiracy where the statements were nothing more than a report of the coconspirator's activities or casual admissions of culpability. While we do not dispute the legitimacy of these holdings, we conclude that the present case is distinguishable.

■ Here, the statements made by Swim to his wife, Silvia, and stepson, David, may be viewed as being designed to enlist their assistance or to induce their aid in achieving one of the objectives of the conspiracy, namely the receipt of payment from Appellant for Swim's role as a hit man. Notably, Swim's statement to his wife was that a woman in her forties, later identified by him as Appellant, would bring "you," meaning Silvia, some money. Similarly, the statement to David was that the money would be brought to "us," meaning the family. Thus, the statements had the effect of involving Silvia and David in the conspiracy, as far as collecting payment for Swim's participation. Accordingly, we cannot say that the trial court abused its discretion in finding that the statements were made during the course and in furtherance of the conspiracy to kill Bill Dyer.

## II. Continuance to Obtain Independent Mental Evaluation

For her second point for reversal, Appellant argues that the trial court erred in denying her motion for a continuance so that she could obtain an independent mental evaluation. The record reflects that Appellant received a court-ordered mental evaluation to determine whether she was competent to assist in her trial. Appellant then filed a motion for an independent evaluation on the ground that the report from the first evaluation contained inaccurate information, such as listing her husband's name incorrectly. Appellant also filed a motion for continuance until the independent evaluation could be done. The trial court denied the continuance for three reasons: (1) Appellant was not diligent in seeking an independent evaluation; (2) there was no evidence that she had a history of mental illness or was otherwise not capable of assisting in her defense; and (3) her claim that the psychologist's report contained inaccuracies was self-serving. Appellant now contends that the trial court's ruling was erroneous. We disagree.

 This court has repeatedly held that the grant or denial of a continuance is within the sound discretion of the trial court, and its decision will not be reversed absent an abuse of discretion amounting to a denial of justice. *See Dirickson v. State*, 329 Ark. 572, 953 S.W.2d 55 (1997); *Miller v. State*, 328 Ark. 121, 942 S.W.2d 825 (1997); *Turner v. State*, 326 Ark. 115, 931 S.W.2d 86 (1996). The following factors are to be considered by the trial court: (1) the diligence of the movant; (2) the probable effect of the testimony at trial; (3) the likelihood of procuring the attendance of the witness in the event of a postponement; and (4) the filing of an affidavit, stating not only what facts the witness would prove, but also that the appellant believes them to be true. *Id.* To demonstrate error on appeal, an appellant must show that he or she was prejudiced by the trial court's denial of the continuance. *Id.*

 When an accused raises the defense of mental disease or defect or places his or her competency in issue, the trial court must follow the procedures for evaluation set out in Ark. Code Ann. § 5-2-305 (Repl. 1997). An evaluation performed under section 5-2-305 does not ordinarily require a second opinion, and further evaluation is discretionary with the trial court. *Dirickson*, 329 Ark. 572, 953 S.W.2d 55. In other words, "the State is not required to pay for a defendant to shop from doctor to doctor until he finds one who will declare him incompetent to proceed with his trial." *Id.* at 577, 953 S.W.2d at 57 (citing *Brown v. State*, 316 Ark. 724, 875 S.W.2d 828 (1994)). Indeed, the law is well settled that an accused is presumed competent to stand trial, and the burden of proving incompetence is on the accused. *See Turner*, 326 Ark. 115, 931 S.W.2d 86.

Here, the record reflects that Appellant sought and was granted an evaluation pursuant to section 5-2-305. Appellant was then evaluated by Dr. Lillian Chaney, a psychologist in Hot Springs. During the hearing below, Appellant's attorney explained that they had initially sought an evaluation because there was some question as to whether Appellant, who was under medication and had experienced some memory loss, was able to aid in her defense. Although the report is not contained in the record, we may presume that Dr. Chaney determined that Appellant was competent to proceed with her trial.

In denying the motion for continuance, the trial court emphasized that Appellant had not been diligent in attempting to get a

second evaluation. The record demonstrates that Dr. Chaney's report was received by the defense on August 30, 1999; however, no request was made for an independent evaluation until September 16, 1999. The trial court pointed out that Appellant had private counsel and had her own source of funds, such that she did not need a court order to obtain a second evaluation. The trial court also noted that the State had offered to assist in providing funds for an independent evaluation. Moreover, the trial court found that the delay requested by Appellant was due to her psychologist's schedule and was not related to the length of time necessary to complete the tests, which the psychologist testified could be done in two to three days.

Additionally, the trial court was not persuaded by the legitimacy of the reasons given for the second evaluation. There was simply no evidence offered by Appellant that she had actually suffered from a mental disease or defect or was otherwise incompetent to stand trial. Rather, the reasons given for the second evaluation was to correct factual inaccuracies contained in Dr. Chaney's report, such as the name of Appellant's new husband and the location where they were married. Neither the motion for the second evaluation nor the testimony of the defense's psychologist asserted that Appellant was not competent to stand trial. Moreover, Appellant's defense was one of general denial and was not based on a claim of mental disease or defect. Accordingly, Appellant has failed to show that she was prejudiced by the trial court's denial of her motion for continuance. See *Turner*, 326 Ark. 115, 931 S.W.2d 86. We thus cannot say that the trial court abused its discretion.

### III. Prior Threats

For her last point for reversal, Appellant argues that the trial court erred in admitting testimony of Appellant's prior bad acts and statements made by her about killing her husband. The evidence in question came from six witnesses. The first, Brenda Cranford, testified that, during the warm months of 1997, Appellant asked if Brenda "had any knowledge of how she could do away with Bill and there not be any trace to be traced back to her such as poison, pesticides and things like that." Cranford stated that approximately four to six weeks after Appellant's inquiry, Bill Dyer was hospitalized.

Busta Willis testified that during the fair season of 1998, Appellant had confided in Willis that she and her boyfriend had been caught in an extramarital affair by her boyfriend's wife. According to Willis, Appellant stated that her boyfriend's wife told her that she was going to tell Appellant's husband about the affair. When Willis asked Appellant if she was going to get out of her marriage, Appellant stated that the only way that she could get out of it was if her husband were dead.

Debbie Hibbs, the girlfriend of Steven Swim, testified that about one month prior to the murder, she overheard a conversation between Appellant and Swim. According to Hibbs, Appellant "said that she wished she knew someone that could kill her husband, and Steven said, 'I might know somebody that can help you,' and then he just kind of laughed."

The remainder of the challenged testimony was provided by Appellant's three daughters. Kelli Dyer, the youngest daughter, testified that she suspected Appellant's involvement in her father's murder because Appellant had "made threats before that she wishe[d] my dad was dead, and that she was gonna kill him[.]" Kelli stated that within three years prior to the murder, one of Appellant's boyfriends, a farm-hand that had lived with the family, asked Kelli if she would move away with him and Appellant if they were to get rid of her father. Kelli stated that they were talking about making it look like a farming accident so they could collect more insurance money. Kelli also described an incident involving a glass of iced tea prepared for her father by Appellant:

> My mama told me before that she was gonna get rid of dad, and a week later we were eating supper, and dad drank some tea, and he took a drink of it, and he said, he said, "Something's wrong with this tea." And I was like, "Well, let me taste it," and he handed me the glass of tea, and mom jumped up and grabbed it, and she said, you know, she took it from me, and she went towards the sink with it, and she acted like she took a drink of it and she dumped it out, and she said, "Nothing's wrong with this tea. I don't taste anything." And later that night dad, after we finished supper, dad got up and he was real pale, and he laid down on the couch, and he got up later off the couch and he collapsed on the concrete, and he busted his head open[.]

According to Kelli, her father was hospitalized that night. This was the same period of hospitalization described by Brenda Cranford.

Jodi Dyer, Appellant's middle daughter, testified about an incident that occurred when Appellant worked for a doctor in DeQueen. Jodi stated that one afternoon when she stopped by the office, she saw Appellant and Dr. Brown talking. Jodi stated that prior to that date, she had had an argument with her father that resulted in her being disciplined. According to Jodi, Dr. Brown told her that she should not have to put up with her father's discipline, and that they could kill her father "by giving him a pill that would speed up his heart and it would look like a heart attack and nobody would ever know." In response to Dr. Brown's statement, Appellant asked Jodi if she would tell anybody if that happened. Jodi responded that she would. Jodi also testified about an incident involving one of her former boyfriends, in which Appellant told her that she knew the boy hunted a lot and was good with a gun. Appellant then asked Jodi: "Why don't you ask him if he would go hunting with your dad and make it look like an accident?"

Lastly, Appellant's oldest daughter, Nicki Harris, testified that during the three years before the murder, Appellant made ongoing threats about killing her father. On one of those occasions, Appellant informed Nicki that Appellant's boyfriend, Chuck Lange, "knew people, and that he could have him killed, or knew how she could get stuff to kill him." Nicki also described an occasion in which Appellant stated that if she killed her husband, she would not feed the family's pigs for several days so that she could then dispose of her husband's body by throwing it in the pig pen, where the pigs would eat it.

Appellant objected to the foregoing testimony on the ground that the acts and statements were too remote and that the probative value of the evidence was substantially outweighed by the danger of unfair prejudice, in violation of Ark. R. Evid. 403. The trial court allowed the testimony under Ark. R. Evid. 404(b), but limited the State to acts or statements that occurred within three years prior to trial. On appeal, Appellant argues only that the trial court's ruling is erroneous under Rule 403. There is no merit to this argument.

Rule 404(b) provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other

purposes, such as proof of motive, opportunity, intent, prepara-
tion, plan, knowledge, identity, or absence of mistake or accident.

The test for admitting evidence under Rule 404(b) is whether
evidence of the other act has independent relevance. *Haire*, 340
Ark. 11, 8 S.W.3d 468. Evidence is indisputably relevant if it proves
a material point and is not introduced solely to prove that the
defendant is a bad person. *Id.* Although evidence may be relevant
under Rule 404(b), it nonetheless may be excluded under Rule 403
if its probative value is substantially outweighed by the danger of
unfair prejudice or confusion of the issues. *See Jones v. State*, 340
Ark. 390, 10 S.W.3d 449 (2000). Trial courts have broad discretion
in deciding evidentiary issues, including the admissibility of evi-
dence under Rules 403 and 404(b), and those decisions will not be
reversed absent an abuse of discretion. *Id.*; *Haire*, 340 Ark. 11, 8
S.W.3d 468.

██ ██ Appellant was charged with having killed her hus-
band, alone or in conjunction with Steven Swim. It was the State's
theory that Appellant did not actually commit the act that killed her
husband. Rather, the State alleged that Swim fired the shot that
killed the victim, but that he had done so at Appellant's request. It
was thus crucial to the State's case to show Appellant's intent or
motive to kill her husband. As this court has held, intent or state of
mind is seldom capable of proof by direct evidence and must usually
be inferred from the circumstances surrounding the killing. *Gaines*,
340 Ark. 99, 8 S.W.3d 547. Thus, "[t]hreats made by a defendant
prior to the time a homicide occurred are admissible to establish
motive and ill will, even where they are never communicated to the
victim." *Id.* at 111, 8 S.W.3d at 555 (citing *Starling v. State*, 301 Ark.
603, 786 S.W.2d 114 (1990); *Pitts v. State*, 273 Ark. 220, 617
S.W.2d 849 (1981); *Lang v. State*, 258 Ark. 504, 527 S.W.2d 900
(1975)). In *Lang*, this court held that there was no error in admit-
ting testimony that, two years prior to the murder of her husband,
the defendant had asked the witness if he knew anyone that she
could hire to kill her husband, for which she would pay $10,000 to
$30,000 from the insurance proceeds. This court held:

> The testimony was properly admitted in evidence. Threats,
> although not communicated to the victim of the homicide, are
> admissible as tending to show ill will and motive. *Crowe v. State*,
> 178 Ark. 1121, 13 S.W.2d 606 (1929). Remoteness in time is to be
> considered when the interval between former difficulties and the
> homicide is so great as to indicate that they had their origin in

> independent causes. *Billings v. State*, 52 Ark. 303, 12 S.W. 574 (1889). In *McElroy v. State*, 100 Ark. 301, 140 S.W. 8 (1911), we upheld the admissibility of threats made about a year and a half before the homicide. Underhill points out, with regard to proof of marital difficulties, that the fact that such troubles cover a period of years and continue down to the death strengthens such evidence. Underhill, *Criminal Evidence*, 645 (5th ed., 1957).

*Id.* at 505, 527 S.W.2d at 901.

In the present case, Appellant's prior threats to kill her husband were highly probative of her ill will toward him and of her motive or intent to kill him, especially since she had evidently succeeded in her threats. They further demonstrate her willingness to solicit others to carry out her plans, just as she had done by getting Steven Swim to commit the murder. We agree with the State that the probative value of the prior threats is strengthened by the fact that they were made throughout the three-year period preceding the murder, thus establishing a continuing course of conduct that persisted until the victim's death. Furthermore, the testimony offered by Kelli Dyer about Appellant's apparent attempt to poison the victim was highly probative of Appellant's motive and intent to kill him. We thus conclude that the trial court did not abuse its discretion in ruling that the probative value of this evidence was not substantially outweighed by the danger of unfair prejudice to Appellant.

### IV. Rule 4-3(h) Compliance

Because Appellant was sentenced to life imprisonment, we have reviewed the record for adverse rulings objected to by Appellant but not argued on appeal, in accordance with Ark. Sup. Ct. R. 4-3(h). No such reversible errors were found. For the aforementioned reasons, the judgment of conviction is affirmed.