Ricky Glenn STEWARD *v.* STATE of Arkansas

CA CR 05-221 233 S.W.3d 180

Court of Appeals of Arkansas

Opinion delivered March 22, 2006

[Rehearing denied April 26, 2006.*]

---

* ROBBINS and GRIFFEN, JJ., would grant rehearing.

*Ronald L. Davis, Jr., Law Firm, PLLC,* by: *Ronald L. Davis, Jr.,* for appellant.

*Mike Beebe,* Att'y Gen., by: *Nicana Corinne Sherman,* Ass't Att'y Gen., for appellee.

ROBERT J. GLADWIN, Judge. Appellant Ricky Glenn Steward was charged with four counts of attempted capital murder and one count of attempted first-degree murder, stemming from events that occurred on June 1, 2003, involving five police officers from the Jackson County Sheriff's Department. A Jackson County jury found appellant guilty of one count of attempted second-degree murder and three counts of aggravated assault and found him not guilty of all charges related to one particular officer. Following the jury's verdict, the trial court sentenced him to serve twenty-five years at the Arkansas Department of Correction. Appellant raises two points on appeal: (1) the trial court erred in granting the State's motion to restrain him in the presence of the jury during trial; and (2) the trial court erred in denying his motion to suspend the proceedings to determine whether he was competent to stand trial. We affirm.

On June 20, 2003, the Jackson County Circuit Court ordered that appellant undergo a mental-health evaluation upon defense counsel's motion. Dr. William Cochran, a psychologist at the North Arkansas Human Services System in Kensett, interviewed appellant. In appellant's history, it was noted that Dr. Cochran had previously evaluated him on April 16, 2002, and had opined at that time that he was competent to stand trial on charges unrelated to the current charges and was able to appreciate the criminality of his actions and to conform his behavior to the requirements of the law. Based on appellant's most recent examination, Dr. Cochran determined that appellant demonstrated a fully-developed, persecutory-type delusion, and Dr. Cochran opined that appellant was not currently competent to stand trial. On September 12, 2003, the trial court entered a not-fit-to-proceed commitment order. The trial court found that, pursuant to Ark. Code Ann. § 5-2-310, the proceedings would be suspended and that appellant would be committed to the custody of the Director of the Department of Human Services for detention, care, and treatment until restoration of fitness to proceed. The Department was ordered to report back within ten months.

On September 23, 2003, appellant was admitted to the Arkansas State Hospital (ASH) for treatment, and a forensic report was filed on February 17, 2004. In an initial interview, Dr. Charles H. Mallory, a staff psychologist, found him "unresponsive and preoccupied with military protocol and an apparent active delusion in which he perceived the ASH staff as involved in his military detention . . . ." Over the course of his treatment, appellant told the staff that in the early 1990s he began to understand that the county judge and the Newport police were corrupt and that it was his duty to correct the situation. On October 17, 2003, appellant was "discovered crawling on his belly in front of the nurses' station, and had a razor in his hand, saying that his mission was to 'take out everybody' on Gunny's orders." Appellant had been taking Haldol and Zyprexa for approximately four months at the time of examination on January 23, 2004. In the forensic report, Dr. Mallory and Dr. Kenneth Dowless, a forensic staff psychiatrist, noted that appellant had improved from his previously diagnosed condition. The doctors reported that, at the time of the examination, appellant had mental disease but not mental defect and that he had the capacity to understand the proceedings against him and the capacity to assist effectively in his own defense. They concluded, "It is unlikely that his mental condition will deteriorate due to the stress of awaiting trial or the stress of trial itself, *as long as he can be*

*maintained on his current regimen of medications.''* (Emphasis in original.) The doctors also opined that, at the time of the alleged offenses, appellant did not lack the capacity to appreciate the criminality of his conduct but that, due to mental disease, he lacked the capacity to conform his conduct to the requirements of the law.

A competency hearing was held on June 21, 2004, at the conclusion of which, the trial court stated that "the defendant does not fit under the McNaughton rule at the time of the event, that it is a fact question, will be a fact question for the jury." Appellant does not challenge any aspect of that proceeding.

Appellant's trial was scheduled for August 2, 2004. On July 22, 2004, the State filed a motion to require that appellant be restrained during the proceedings. A hearing on the State's motion to restrain was held on August 2, 2004, and the trial court heard testimony regarding charges that arose from events that occurred in 1997 and in 2001 and testimony relating to the current charges stemming from events that occurred on June 1, 2003.

### Events on November 27, 1997

The evidence showed that on November 27, 1997, Newport Police Officer Wade Honey was standing at the back door of the police department when he saw a white car going the wrong way on Second Street, which runs between the sheriff's office and the police department. The car's headlights were not on, and it was traveling at approximately eighty miles per hour. Honey began the pursuit, and Creston Hutton with the Arkansas State Police was called to assist. Hutton attempted to block the road using his police vehicle. Instead of stopping, appellant rammed his vehicle into the rear of Hutton's car. In continuing the pursuit, appellant narrowly avoided a head-on collision with Sheriff Jim Bishop's car. At another point during the pursuit, Honey pulled in front of appellant's stopped car, and Hutton attempted to block it by pulling in behind him. Appellant backed up his car and rammed it into the front of Hutton's car, and then drove forward, hitting Honey's car, before he fled again. Honey fired one round into the rear bumper of appellant's car. At the Waldenburg city limits, appellant slammed on his brakes and then backed up and almost hit Lieutenant Michael Scudder's car. Honey forced appellant's vehicle into a ditch, where it became stuck in the mud. According to Honey, appellant "held the accelerator wide open till the engine blew up."

Officers then attempted to get appellant out of the vehicle. Appellant put his arms up through the steering wheel and refused to let go. Honey climbed into the front seat while another officer struggled from the other side to force appellant's arms back through the steering wheel. Finally, they got him loose, and the other officer dragged appellant out through the car's window. Scudder recalled that appellant spit on an officer. Appellant was pepper sprayed, and it took several officers to get him out of his car and handcuffed.

Scudder testified that he had not seen appellant cause any trouble inside a courtroom but that he recalled a disruption getting appellant to go inside the courthouse after leaving the jail. Scudder also recalled that, when appellant was being taken back to the jail, the deputy he was following had to pull over because appellant had kicked the door so hard that it bowed. The officers put a different restraint on him so that he could no longer kick the door.

### Events on July 11, 2001

Patrolman Michael Calendar with the Newport Police Department testified that on July 11, 2001, he saw a suspicious van in a residential neighborhood. He said that the van pulled over and let him pass every time he attempted to run the tags on it. He said he noticed the van following him. He turned around to return to the neighborhood, and the van turned around as well. Calendar finally got an opportunity to run the tags, and he learned that the van belonged to appellant out of North Carolina. Calendar was instructed by another officer to stop the vehicle in order to find out whether the driver was lost. Calendar activated his lights, but appellant continued to drive. Patrolman Mike Wilson joined the pursuit, and Calendar activated his siren. Lieutenant David Ervin also joined the pursuit. Two officers from the Diaz Police Department, who had been called to assist, attempted to block appellant's van. As Diaz Sergeant Charles Moss was exiting his car, the van slowed, then accelerated suddenly, and hit the Diaz patrol car, disabling both cars. Diaz Officer Dale Jackson testified that appellant exited his vehicle and began ranting that the officers had hit his van. Appellant kept coming toward the officers, even though they had instructed him to get on the ground, and Jackson even drew his weapon at one point. When the other units arrived, appellant fled on foot.

Scudder encountered appellant running in his direction. Scudder attempted to block appellant's path with his car. Appellant went over the hood, fell to the ground, and then got up and

continued to run. Eventually, the officers decided to stop pursuing appellant, and so they returned to the scene of the accident. Appellant returned to the scene as well and yelled and cursed at the officers. When the officers attempted to chase him, he fled again. According to Scudder, appellant called 911 from every payphone between the scene of the accident and the police department. Scudder said that appellant was sitting in front of the police department the following morning but would not let the officers get close.

### Events on June 1, 2003

Sergeant James Brock with the Jackson County Sheriff's Department testified regarding the incident that occurred on June 1, 2003, that led to appellant's current charges. Brock and Deputy Toni Moss were dispatched to appellant's residence in reference to "unknown trouble." A child opened the door to the residence, and Brock saw appellant sitting in a chair across the room. Appellant appeared to be calm and assured the officers that everything was all right. The officers left the residence, but within five or ten minutes, they were summoned back to the residence. Brock, Moss, Tammy Selvidge, a reserve deputy in training, Deputy Chuck Benish, and Sergeant Mike Miller responded. As they arrived at his residence, appellant fired several shots at them, and one of the bullets hit Moss in the leg. Appellant then fled the scene and remained at large for three days.

Following the hearing on the State's motion to restrain appellant during the proceedings, appellant gave the trial judge his word as a United States Marine that he would not disrupt the proceedings. The trial court did not specifically rule on the State's motion at that point in time.

Before the trial proceedings began on the following day, defense counsel requested a bench conference. Defense counsel informed the trial court that appellant said he was hearing voices and suggested that the court allow appellant to speak to one of the doctors present at the proceedings. The trial judge responded, "Well, I've done that once."

The trial proceedings resumed, and some time later, defense counsel asked for another bench conference. Defense counsel again advised the trial court that appellant said he was hearing voices. Specifically, appellant was having conversations with "Gunny" who informed him that he had a right to be tried in military court. At that point, the trial judge ruled that appellant

would be restrained during the trial, but he gave the jury a limiting instruction. In his ruling, the trial judge stated:

> All right, the Court will make a record that he is not shackled but he has leg chains on and the reason is that the prior actions of the defendant, how strong he is, and unresponsive he is, I'm afraid to get him around the jury but I have kept his leg chains on. With the strength of the defendant and his prior actions with the police officers indicate to me that he should be in chains and the fact that he has run before from police. I'll give them a limiting instruction at the correct time. I think I'm required to as a matter of fact. I'll tell them that now.

At a third bench conference, defense counsel told the court that appellant was still communicating with his gunnery sergeant and that his competency to stand trial was being called into question again. The trial court refused to order an additional mental evaluation.

Toward the end of appellant's case in chief, defense counsel informed the trial court that appellant wished to testify against counsel's advice. The following colloquy occurred between the trial court and appellant:

> APPELLANT: Sir, as a United States Marine, my staff non-commissioned officer, Gunny Sergeant Williams, has authorized me to testify before you at this time, Sir.
>
> THE COURT: Well, what does that mean, Mr. Steward?
>
> APPELLANT: It means my Gunny told me to get up there and tell the truth.
>
> THE COURT: Do you wish to testify?
>
> APPELLANT: Yes, sir.
>
> THE COURT: Do you understand you have the right not to testify?
>
> APPELLANT: As it stands right now, my Gunny told me to testify, I will testify, Sir.
>
> THE COURT: And you understand that your Gunny Sergeant is not your lawyer and he is not skilled like your lawyer is.
>
> APPELLANT: I've been in the marines fourteen years, he hadn't steered me wrong yet, Sir.

THE COURT: Well, step around here and get on the stand.

Appellant testified that the police had been harassing him since 1997. He stated that he believed the officers who arrived at his residence on June 1, 2003, were there to kill him. In fact, he heard one of the officers say, "Let's kill him this time." Appellant stated that he was under orders from "Gunny" to fire at the officers so that they would leave him alone. He insisted, however, that he was not trying to kill the officers. He said he was an expert with the M-16 A2 service rifle and could have shot and killed the officers if he had wanted to do so. Appellant testified that "Gunny" was real and that the Marine Corps had sent "Gunny" to assist him in his secret mission to liberate Newport. Appellant stated that at the state hospital, which he referred to as an interrogation camp, doctors had diagnosed mental disease or defect. He insisted, however, that he did not have a problem. Concerning his secret mission, appellant testified that he had collected information about key officials in Newport and was sending the information to the Department of Justice in Washington, D.C.

On cross-examination by the prosecutor, appellant stated, "Sir, it is my duty to let you know that I am a prisoner of war. Under the Prisoner of War Act of the Geneva Commission (sic), the only thing I can be allowed to give you is my name, rank, and serial number. I cannot be interrogated." The prosecutor responded, "You can't even acknowledge if you know who I am?" Appellant answered, "Steward, Staff Sergeant, 43143704."

Following deliberations, the jury convicted appellant of attempted second-degree murder against Moss and three counts of aggravated assault against Selvidge, Brock, and Miller. The jury found appellant not guilty of all charges that pertained to Benish. Because the jury was unable to arrive at a decision on appellant's sentence for the offenses, the trial court sentenced him to serve twenty-five years at the Arkansas Department of Correction.

On appeal to this court, appellant first argues that the trial court erred in granting the State's motion to require him to be restrained during the proceedings. Arkansas Rule of Criminal Procedure 33.4 provides the following:

> Defendants and witnesses shall not be subjected to physical restraint while in court unless the trial judge has found such restraint reasonably necessary to maintain order. If the trial judge orders such restraint, he shall enter into the record of the case the reasons

therefor. Whenever physical restraint of a defendant or witness occurs in the presence of jurors trying the case, the judge shall upon request of the defendant or his attorney instruct the jury that such restraint is not to be considered in assessing the proof and determining guilt.

It is not prejudicial per se when the defendant is brought into a courtroom handcuffed or leg-cuffed. *Townsend v. State*, 308 Ark. 266, 824 S.W.2d 821 (1992). Almost without exception, our prior decisions that have upheld the use of restraints have involved defendants charged with violent offenses or who have engaged in disruptive behavior, or attempted escape. *Id.* The trial court has discretion to use physical restraints on a defendant for security purposes and to maintain order in the courtroom. *Woods v. State*, 40 Ark. App. 204, 846 S.W.2d 186 (1993). Moreover, the trial judge is in a better position to evaluate the potential security risks involved. *Id.* We will not presume prejudice when there is nothing in the record to indicate what impression may have been made on the jurors and when appellant has offered no proof of prejudice. *Hill v. State*, 285 Ark. 77, 685 S.W.2d 495 (1985).

 Appellant argues that the record does not support the trial court's reasons for restraining him. He further argues that the State's witnesses conceded that he had never been disruptive in a courtroom before and that he was quiet during the proceedings. The record does indeed support the reasons stated by the trial court. Appellant was charged with having committed violent offenses and was clearly prone to fleeing from authorities. Scudder testified that it took several officers to remove appellant from his vehicle and get him handcuffed and that it was not easy to subdue appellant even with the use of mace. Scudder also testified that appellant kicked a patrol car's door so hard that it bowed. Under these circumstances, we cannot say that the trial court abused its discretion in ordering that appellant be restrained during the proceedings. Moreover, the trial court properly instructed the jury to disregard the fact that appellant had on leg chains and to give that fact no consideration during its deliberations as to appellant's guilt or innocence. Furthermore, appellant cannot show that prejudice resulted from the trial court's use of restraints because the jury convicted him of lesser-included offenses, found him not guilty of any offense related to one officer, and could not agree on what sentence he should receive.

Next, appellant argues that the trial court erred in refusing to suspend the proceedings to ascertain whether he was competent to stand trial. Arkansas Code Annotated section 5-2-302 provides that no person who, as a result of mental disease or defect, lacks capacity to understand the proceedings against him or her or to assist effectively in his or her own defense shall be tried, convicted, or sentenced for the commission of an offense so long as such incapacity endures. If the court determines that the defendant lacks fitness to proceed, the proceeding against him shall be suspended. Ark. Code Ann. § 5-2-310(a). If the court, pursuant to the report of the Director of the Department of Human Services, or as a result of a hearing on the report, determines that the defendant is fit to proceed, prosecution in ordinary course may commence. Ark. Code Ann. § 5-2-310(b)(2)(B).

When an accused raises the defense of mental disease or defect or places his or her competency in issue, the trial court must follow the procedures for evaluation set out in Ark. Code Ann. § 5-2-305. An evaluation performed under that section does not ordinarily require a second opinion, and further evaluation is discretionary with the trial court. *Dyer v. State*, 343 Ark. 422, 36 S.W.3d 724 (2001).

The law is well settled that a criminal defendant is presumed to be mentally competent to stand trial, and the burden of proving incompetence is on that defendant. *Key v. State*, 325 Ark. 73, 923 S.W.2d 865 (1996). The test for determining an accused's competency to stand trial is whether he is aware of the nature of the proceedings against him and is capable of cooperating effectively with his attorney in the preparation of his defense. *Id.* On appellate review of a finding of fitness to stand trial, we affirm if there is substantial evidence to support the trial court's finding. *Mitchell v. State*, 323 Ark. 116, 913 S.W.2d 264 (1996).

Appellant argues that two psychologists and a psychiatrist diagnosed mental disease and defect and that Dr. Mallory and Dr. Dowless determined that he was unable to conform his conduct to the requirements of the law relative to incidents that occurred in 1997 and 2001. Appellant concedes that the trial court conducted a hearing on his competency but asserts that, "however, unlike a determination of ones (sic) capacity to conform his conduct with the requirements of the law at a particular time, the issue of whether the appellant was fit to proceed should always be considered, irrespective of any prior considerations of the same." He argues that, because his counsel made the trial court aware that he

(appellant) was hearing voices during the course of the trial, there was clearly sufficient reason to doubt his fitness to proceed pursuant to Ark. Code Ann. § 5-2-305(D).

■ According to Dr. Mallory and Dr. Dowless, appellant did not lack the capacity to understand the proceedings against him and to assist effectively in his own defense, which is the linchpin of Ark. Code Ann. § 5-2-302(a). The trial court properly suspended the proceedings and ordered that appellant undergo a mental-health evaluation upon defense counsel's motion in accordance with Ark. Code Ann. § 5-2-305. Once his fitness to proceed was restored, the prosecution commenced in accordance with Ark. Code Ann. § 5-2-310. Here, the trial court followed the dictates of the statutes to the letter, and any further mental-health evaluations were purely discretionary with the trial court. There was no evidence, and appellant has not so much as suggested, that he was not receiving the regimen of medications prescribed to treat his mental condition. The trial court was in a better position to judge whether an additional mental-health evaluation was warranted based on appellant's alleged hearing of voices. Under these circumstances, we cannot say that the trial court abused its discretion.

Affirmed.

VAUGHT, CRABTREE, and BAKER, JJ., agree.

ROBBINS and GRIFFEN, JJ., dissent.

JOHN B. ROBBINS, Judge, dissenting. It should be an extraordinary circumstance to require a defendant to be shackled with leg chains throughout a trial and in full view of his jury. However, I agree with the majority that such a situation existed during Steward's trial. The trial court was of the opinion that Steward posed a serious risk to the safety of the jury and court personnel, and there was ample evidence to support such an opinion. Steward had been diagnosed by Dr. Charles H. Mallory and Dr. Kenneth Dowless, forensic staff psychologists with the Arkansas State Hospital, as suffering schizophrenia, paranoid type, continuous, and the majority opinion summarizes some of the bizarre behavior of Steward within recent years. Consequently, on this issue I concur with the majority's decision to affirm.

It is with the second issue that I disagree with today's decision. Steward contends that the court erred in refusing to

suspend the trial proceeding to ascertain whether he was competent to stand trial. For the following reasons I agree with Steward's contention.

Steward's jury trial was conducted on August 2, 2004. At this time other charges were pending against him. More than one year earlier, on June 17, 2003, the trial court ordered a mental evaluation prior to trial on one of these other charges. Dr. William Cochran, a licensed psychologist with the North Arkansas Human Services System, conducted an evaluation in which he found that Steward was delusional with paranoid ideation and concluded with an opinion that Steward was not competent to stand trial. Consequently, all criminal prosecutions against Steward were suspended and he was committed to the custody of the Director of the Department of Human Services for inpatient detention, care and treatment until restoration of fitness to proceed.

On February 17, 2004, a report pertaining to Steward was filed with the trial court from Dr. Charles Mallory and Dr. Kenneth Dowless. The report was based upon Steward's court, police and psychological history, and interviews with Steward held on September 23, 2003, and January 23, 2004. Two significant points relevant to this appeal were presented in this report. First, Dr. Mallory expressed his opinion that at the time of the alleged criminal offenses, due to mental disease, Steward lacked the capacity to conform his conduct to the requirements of the law. Secondly, Dr. Mallory opined that Steward was now competent to proceed to trial and "it is unlikely that his mental condition will deteriorate due to the stress of awaiting trial or the stress of trial itself, *as long as he can be maintained on his current regimen of medications.*"

Following receipt of this report, which was also signed by Dr. Kenneth Dowless, a hearing was held on June 21, 2004. The hearing is significant, not so much as to what was decided, but what was not. At the conclusion of the hearing the trial court stated:

> [T]he Court rules that the defendant does not fit under the McNaughton rule at the time of the event, that it is a fact question, will be a fact question for the jury.

Clearly, because of the court's reference to the McNaughton rule, the issue was whether Steward lacked the capacity to conform his conduct

to the requirements of the law at the time of the alleged criminal conduct. The court did not address Steward's competency to proceed to trial.

Although no ruling had been made regarding Steward's fitness to proceed since summer of 2003 when the court found him not competent to proceed to trial, a jury trial was held on August 2, 2004. Three times during the trial Steward's attorney brought to the attention of the trial judge that Steward indicated that he was having continuing conversations with "Gunny," Steward's gunnery sergeant, apparently from when Steward was serving in active duty with the United States Marines. These three colloquies include the following statements:

First colloquy —

> DEFENSE COUNSEL: Judge, my client tells me, I just talked to him, he's hearing voices and I bring that to the Court's attention because I think I'm duty bound to do it. I'm not sure what I'm asking other than to advise the Court.
>
> . . . .
>
> But because we had this issue, I think the law requires me to advise the Court and the Court makes a determination that he needs some clarification that he talk to one of the doctors, one of them is here.

THE COURT: Well, I've done that once.

Second colloquy —

> DEFENSE COUNSEL: Judge, again for purposes of the record, on each session when we break or anything, I always try to talk to Mr. Steward and I did in this instance talk to Mr. Steward to see if I'm confident about his mental state, and just to bring to the Court's attention again that he continues to say that he's having conversations with Gunny and in particular last night about him having the right to be tried in a military Court.

THE COURT: All right, the Court will make a record that he is not shackled but he has leg chains on and the

reason is that the prior actions of the defendant, how strong he is, and unresponsive he is, I'm afraid to get him around the jury but I have kept his leg chains on.

Third colloquy —

> DEFENSE COUNSEL: I make my record again that as I indicated to the Court on several occasions during the course of this trial, Mr. Steward has indicated and without giving privileged information that he is still communicating with his gunnery sergeant, and I think thus calls into question his competency to stand trial in this matter; that, I think the rule of law is clear that at any point in time that the court becomes aware or that the competency of the defendant to proceed to trial is brought into question that the court has an obligation to make a finding with regards to whether or not there needs to be any additional evaluation on the subject.
>
> . . . .
>
> THE COURT: The objection is overruled.

It is not clear as to when "that once" occurred, which the trial court mentioned during the first colloquy. At this point, Steward had been examined and reports had been made twice. The first was in June 2003 and resulted in the trial court finding Steward not competent to proceed to trial. The second examination and report was the one dated February 17, 2004, which was the subject of the June 2004 hearing and concluded with the trial court holding that Steward's mental capacity at the time of the alleged offense would be a factual issue for the jury. No ruling was pronounced at that hearing pertaining to Steward's competence or fitness to proceed to trial.

Arkansas Code Annotated section 5-2-305(a)(1) (Repl. 2005) provides in pertinent part:

> [T]he court shall immediately suspend any further proceedings in a prosecution if:
>
> . . . .
>
> (D) There is reason to doubt the defendant's fitness to proceed.

The supreme court has defined the test of competency to stand trial as "whether a defendant has sufficient *present* ability to consult with his lawyer with a reasonable degree of rational understanding and whether he has a rational, as well as factual, understanding of the proceedings against him." (emphasis added) *Haynes v. State,* 346 Ark. 388, 392, 58 S.W.3d 336, 339 (2001); and *see Thessing v. State,* 365 Ark. 384, 230 S.W.3d 526 (2006). Granted, here the trial court had complied with this mandate more than a year before Steward was eventually tried. That suspension resulted in a determination that Steward was not competent to proceed to trial. Steward was committed to the state hospital for treatment. He was placed on a regimen of medication and by January 2004 he had improved to a level that staff psychologists opined that he was competent to be tried, provided he continued to *"be maintained on his current regimen of medications."*

As noted by the majority, an evaluation once performed pursuant to Ark. Code Ann. § 5-2-305 does not ordinarily require a second opinion, and our supreme court has held that further evaluation is discretionary with the trial court. *See Dyer v. State,* 343 Ark. 422, 36 S.W.3d 724 (2001); *Dirickson v. State,* 329 Ark. 572, 953 S.W.2d 55 (1997). While an evaluation based upon interviews with a defendant within the past few days or perhaps few weeks might shed light on whether the defendant has sufficient *present* ability to assist his counsel in his defense, it is indefensible to consider an evaluation based on interviews more than six months earlier as relevant for this purpose under the circumstances of this case. I submit that the trial court should have suspended the trial, at least until Steward could be examined, when it was brought to the court's attention that Steward was hearing voices, especially when Steward stated that he would testify because Gunny was telling him to do so.[1] Clearly, Steward's delusion of hearing instructions from "Gunny" directing him to act contrary to his attorney's recommendations interfered with his ability to consult with his lawyer.

The six-month lapse of time since Steward was last evaluated by a psychologist, the fact that the opinion of the psychologists

---

[1] The prosecution attempted to cross-examine Steward following his direct examination. Steward would only respond by stating his name, military rank and serial number. The fact that the State did not object and/or seek contempt sanctions at this juncture is some indication of the State's opinion of Steward's competency.

who performed that evaluation conditioned Steward's competency on maintenance of his medicinal regimen, and the delusions of Gunny's directions during trial should have triggered application of Ark. Code Ann. § 5-2-305 and its requirement for an evaluation. This is not an instance of doctor shopping that the supreme court discouraged in *Dirickson, supra*, or a case where there was no history of mental illness as in *Dyer, supra*. The trial was so far removed from the previous evaluation that the issue of competency to proceed and a mental evaluation should not be considered discretionary, but rather mandatory pursuant to section 5-2-305. However, even if discretionary, the trial court either failed to exercise his discretion, or if exercised, abused that discretion by failing to have Steward evaluated.

I would reverse and remand for further proceedings, including a current competency evaluation before a new trial.