Ben BRADLEY, Jr. *v.* STATE of Arkansas

CR 94-871 896 S.W.2d 425

Supreme Court of Arkansas
Opinion delivered March 27, 1995

102

*Bryant & Henry*, by: *Barry A. Bryant*, for appellant.

*Winston Bryant*, Att'y Gen., by: *J. Brent Standridge*, Asst. Att'y Gen., for appellee.

ROBERT H. DUDLEY, Justice. Ben Bradley, Jr., appellant, had an affair with Wanda Johnson, aged thirty-four, that lasted until she began dating Grant Perry, Sr., aged seventy-one. Wanda Johnson subsequently moved into Perry's house. On July 8, 1992, a forlorn Bradley killed Perry. Bradley was convicted of first degree murder and sentenced to life imprisonment. We affirm the judgment of conviction.

Randy Perry, the victim's son, testified that before the murder he was told that appellant and his father had gotten into an argument over Wanda Johnson and that appellant had pushed his father down. Wanda Johnson testified that about a month before the murder appellant "still wanted me to be his girlfriend" and "tried to get me back," but that she would not talk to him. Birdell Jones testified that the night Grant Perry was murdered appellant tried to talk to Wanda, but Wanda refused to converse with him.

Sarah Thompson testified that the night of the murder she and Wanda went to the Perry home at about 10:30. Wanda used a brown-handled kitchen knife to cut some Spam to make sandwiches. Perry, who had been asleep in the bedroom, got up, ate

a sandwich, and went back to the bedroom. Sarah Thompson further testified that, as she was leaving the Perry home about 11:00, she saw appellant outside. He walked her home, and during the walk to her home, expressed anger over Wanda's relationship with Perry. He called Wanda and Perry sordid names. She went inside her home, went to bed, and was awakened about midnight and told that Grant Perry, Sr. had been murdered.

Wanda Johnson testified that she went to the bedroom and went to sleep after Sarah Thompson left. She heard a noise and awakened just as appellant turned a light on in the bedroom. She clearly saw appellant standing beside the bed brandishing a brown-handled kitchen knife, the same knife she had used earlier to cut the Spam. She testified that Perry grabbed an ax that was beside the bed and turned the light off. She said that appellant knocked Perry down and began "steady stabbing him." Perry had the ax in his hand, but fell back on the bed. Appellant continued to stab and hit the victim. Wanda testified that she was cut on the leg during the struggle. She testified that the last place she saw the ax was on the floor in the bedroom. She ran from the home.

Ethel May Jones testified that somewhere around 11:00 or 11:30 appellant came to the back of her home. He was bloody and said, "I done killed Grant." She said, "You're going to the pen for life," and he replied that he did not care because Wanda "is the only one [he] ever loved." His hand was cut.

Robert Gorum, a criminal investigator, who was present when appellant was arrested later that night, said appellant's hand was bleeding. He testified as follows:

> [H]e and another fellow were sharing a lady and had gotten into an argument. The other person, I believe, Mr. Perry had pulled a knife on him. He took the knife away from him, that's how he got cut. That he stabbed him, and then he and the lady had walked down the road, and then threw the knife in the bushes.

Peter Briggs, a deputy sheriff, testified that appellant told him he threw the knife away, but did not know where it was because it was dark.

Crime scene experts and a forensic pathologist established that the victim had twenty-four stab wounds. The wounds var-

ied in size and shape and were in the left side of the face, the left and right sides of the chest, and the right leg. The fatal wound, eight inches deep, penetrated the left lung. Another cut, a long cut, went from the lower back to the upper buttock. A forensic pathologist testified that in his opinion the five wounds on Perry's fingers, hands, and arms were inflicted when he was trying to defend himself. Blood was found in the bedroom only, but for some unexplained reason the ax was found in the bathroom without any blood on it. All of the other physical evidence indicated that the victim never left his bedroom. In sum, the evidence of appellant's guilt is overwhelming.

We first discuss appellant's point of appeal involving the prosecutor's comment on his right not to testify. The trial court instructed the jury:

> A defendant has an absolute constitutional right not to testify. The fact that Ben Bradley did not testify is not evidence of guilt or innocence and under no circumstances, shall be considered by you in arriving at your verdict.

AMI Crim. 111.

In closing argument the prosecor stated that, under the court's instruction, even though the defendant's right not to testify should not be considered evidence of guilt, at the same time, it should not be considered evidence of innocence. Appellant moved for a mistrial, arguing that the prosecutor had commented on his right not to testify by saying that it was not evidence of innocence. The trial court denied the motion on the ground that the State had not gone beyond the bounds of the instruction. Appellant assigns the failure to grant a mistrial as error.

The prosecutor's comment was improper. In *Miller* v. *State*, 239 Ark. 836, 394 S.W.2d 601 (1965), the trial court instructed the jury that it was the privilege of the defendants to testify or not. *Id.* at 843, 394 S.W.2d at 605. In closing, the prosecutor said, "You are instructed this is a privilege to them to either testify or not to testify. That is what the court says in that instruction." *Id.* In reversing and remanding, we wrote: "Obviously, by arguing this instruction to the jury in that manner, attention was called to the fact that defendants had not taken the stand in their own behalf. This was error." *Id.*

█  Although *Griffin* v. *California*, 380 U.S. 609 (1965), extended the protection of the Fifth Amendment to the states, the Arkansas Legislature has provided statutory protection of this right since 1885. *See* Craig Lambert, Note, *Veiled Reference To Failure Of Defendant To Testify Constitutes Reversible Error*, 8 U. Ark. Little Rock L.J. 747, 749 (1985-86). Act 82 of 1885, now codified as Ark. Code Ann. § 16-43-501, provides:

> On the trial of all indictments, informations, complaints, and other proceedings against persons charged with the commission of crimes, offenses, and misdemeanors in this state, the person so charged shall, at his own request, but not otherwise, be a competent witness. The failure of any person so charged to make such a request shall not create a presumption against him.

Ark. Code Ann. § 16-43-501 (Repl. 1994). Early on, we held that violation of this statute would be "presumptively prejudicial." *Bridgman* v. *State*, 170 Ark. 709, 710, 280 S.W. 982, 982 (1926). However, in *Powell* v. *State*, 251 Ark. 46, 471 S.W.2d 333 (1971), we relied on the state statutory harmless error provision and found that the defendant's substantial rights were not violated by such an improper comment.

█  In *Chapman* v. *California*, 386 U.S. 18 (1967), the Supreme Court declared that references to a defendant's failure to testify violate the Fifth Amendment privilege against self-incrimination, but can be harmless error if it is shown beyond a reasonable doubt that the error did not influence the verdict. *Id.* at 615. Practical application of the *Chapman* test involves excising the improper remarks and examining the remaining evidence to determine if it can be shown beyond a reasonable doubt that the error did not influence the verdict. *Logan* v. *State*, 299 Ark. 266, 773 S.W.2d 413 (1989).

██  Here, both the eyewitness testimony and the physical evidence of appellant's guilt were overwhelming. Appellant would have been convicted without the prosecutor's comment. Accordingly, we have no hesitancy in holding that, beyond a reasonable doubt, the error did not influence the verdict. Still, appellant asks us to reverse the case because of the trial court's failure to grant a mistrial after the prosecutor made the comment. We decline to do so. The granting or denial of a mistrial lies

within the sound discretion of the trial court, and the exercise of that discretion will not be disturbed on appeal absent a showing of abuse. *Magar* v. *State*, 308 Ark. 380, 826 S.W.2d 221 (1992). Because the improper comment did not influence the verdict we cannot say that the trial court abused its discretion in refusing to grant a mistrial.

Appellant's next point of appeal involves seating an alternate juror in place of a seated juror. Inez Eason was seated as a juror, but, on the third day of trial and after the State had rested, the trial court received a report that Eason was riding to court each day with a spectator, Josephine Haynes, and that Haynes's son dated appellant's mother. Juror Eason had not mentioned this during voir dire. The trial court conducted an extensive hearing and, in order to avoid any appearance of impropriety, seated an alternate juror in her place. Appellant moved for a mistrial. The trial court denied the motion, and appellant assigns the ruling as error.

Appellant argues that "[t]o remove a juror once the state rests for the reason given, primarily because of an appearance of impropriety, is simply an abuse of discretion. Defendant's motion for mistrial should have been granted." Appellant cites no authority for his argument, and we are not aware of any. We hold that the trial court did not err in excusing juror Eason and seating the alternate juror in order to avoid an appearance of impropriety. *See Ruiz* v. *State*, 273 Ark. 94, 617 S.W.2d 6, *cert. denied*, 454 U.S. 1093 (1981). Since the trial court did not err in seating the alternate juror, it did not err in refusing to grant a mistrial.

Appellant assigns as error the trial court's refusal to give his requested instructions on the lesser included offenses of second degree murder and manslaughter. The trial court refused to give instructions on the lesser included offenses on the ground that there was no rational basis to support such instructions. Appellant contends that his statements to the police, which were introduced, constituted some evidence that the victim attacked him with a knife and that he took the knife from the victim before stabbing him. From that factual basis, he argues that the lesser included offense instructions should have been given because we have held that "adequate provocation can occur when the victim

is armed or is attempting to commit violence toward the defendant." *Rainey* v. *State*, 310 Ark. 419, 423-24, 837 S.W.2d 453, 455 (1992).

We need not determine if the lesser included instructions should have been given because, even if they should have, the instructions proffered by appellant were incomplete and erroneous. The proffered instruction on second degree murder included only "knowingly" causing the death of another. *See* AMI Crim. 1503; Ark. Code Ann. § 5-10-103(a)(1) (Repl. 1993). It omitted "purposefully" causing the death of another. A person also commits second degree murder if "[w]ith the purpose of causing serious physical injury to another person, he causes the death of any person." AMI Crim. 1503; Ark. Code Ann. § 5-10-103(a)(2). The question then becomes whether there was a rational basis to warrant the trial court's giving an instruction for finding that appellant acted knowingly, but not purposely, in killing Perry. To ask the question is to answer it. Since the victim was stabbed twenty-four times, with one of the wounds being eight inches deep, it is obvious that there was a rational basis for finding that appellant acted purposely, and it would have been error to give an instruction that omitted the purposeful part of the definition.

Similarly, appellant's proffered instruction on manslaughter omitted that part of AMI Crim. 1504 incorporating Ark. Code Ann. § 5-10-104(a)(1), which provides:

(a) A person commits manslaughter if:

(1) He causes the death of another person under circumstances that would be murder, except that he causes the death under the influence of extreme emotional disturbance for which there is a reasonable excuse. The reasonableness of the excuse shall be determined from the viewpoint of the person in the defendant's situation under the circumstances as he believes them to be.

Ark. Code Ann. § 5-10-104(a)(1) (Repl. 1993).

Appellant next argues that the trial court erred in refusing to grant a mistrial after the State used a peremptory challenge to strike a black person from the jury panel. We do not consider that part of the point involving the failure to grant a mistrial because appellant did not request a mistrial. He only

made a challenge to the jury panel under *Batson* v. *Kentucky*, 476 U.S. 79 (1986).

Appellant asked that the State provide a racially neutral explanation for striking Allen Morrison, one of four black persons who were potential jurors. The prosecutor replied that there was no systematic exclusion of black people, as two were excused by the court for cause, one was accepted as a juror, and the fourth, Morrison, was excused by the State. In any event, the prosecutor stated that the reason Morrison was excused was that the victim's family provided the prosecutor with a note before voir dire began which said that Morrison was a friend of appellant's family. Morrison did not disclose the friendship during voir dire, but subsequently did admit that he knew appellant's sister.

Under *Batson*, once the defendant makes a prima facie case of purposeful racial discrimination in juror challenges, the burden of proof shifts to the State to show a racially neutral explanation. The showing of a prima facie case under *Batson* is threefold. First, the defendant must show that he is a member of a cognizable racial group. *Batson*, 476 U.S. at 96. Second, he is allowed to rely on the fact that the system of peremptory challenges constitutes a jury selection practice under which it is easy to exercise discrimination if one has a mind to do so. *Id.* Finally, he must show that the facts raise an inference that the prosecutor intended to discriminate. *Id.* In ruling on a *Batson* motion, a trial court shall consider all relevant circumstances, such as a "pattern" of strikes and the prosecutor's questions and statements. *Id.* at 96-97.

If the trial court finds that the defendant has made a prima facie showing, the burden shifts to the State to provide a racially neutral explanation. *Id.* at 97. If the State's explanation is suspect, the trial court must then conduct a sensitive inquiry into the basis for each of the challenges by the State. *Colbert* v. *State*, 304 Ark. 250, 254-55, 801 S.W.2d 643, 646 (1990).

The standard of review for reversal of a trial court's *Batson* ruling is whether the court's findings are clearly against the preponderance of the evidence. *Id.* Appellant's *Batson* challenge was based solely on the peremptory challenge of the one black juror. The trial court did not find a systematic exclusion, but still asked the prosecutor to proffer his reason for striking

the prospective juror. The prosecutor then provided a racially neutral explanation which was confirmed by the juror. Thus, there was no error.

The facts involving appellant's final point of appeal are as follows. The State sought to enhance appellant's punishment under the habitual offender statute, Ark. Code Ann. § 5-4-501, and presented a prior aggravated robbery conviction. The docket sheet of the case bears the handwritten notations that appellant "waives an atty." and "[w]aives an atty. after full exp," and the judgment of conviction states that appellant waived an attorney. Appellant correctly argues that a conviction cannot be used to enhance punishment under the recidivist statutes unless the records of prior convictions show that the defendant was represented by counsel or waived counsel. *Stewart* v. *State*, 300 Ark. 147, 777 S.W.2d 844 (1989). Appellant contends that the docket sheet and judgment of conviction were insufficient to show that he had knowingly waived his right to counsel. A similar argument was thoroughly addressed and rejected in *King* v. *State*, 304 Ark. 592, 804 S.W.2d 360 (1991). In that case, we recognized that while the constitutionally protected right to counsel will not be presumed from a silent record, a record which states that a defendant waived his right to counsel, while not sufficient when arguing violation of the right, is sufficient for a prior sentence to be used for enhancement purposes. *Id.* at 595, 804 S.W.2d at 362; *see also Neble* v. *State*, 26 Ark. App. 163, 762 S.W.2d 393 (1988). The record stated that appellant had waived his right to counsel after full explanation and, as such, was sufficient to use the conviction for enhancement purposes.

Pursuant to Rule 4-3 (h) of the Rules of the Supreme Court, we have a duty to examine the record for prejudicial erroneous rulings adverse to appellant that would cause reversal. An examination of the record has been made, and there are no erroneous rulings adverse to appellant that cause reversal.

Affirmed.