Daniel Nobice PETERS *v.* STATE of Arkansas

CR 03-832                                           166 S.W.3d 34

Supreme Court of Arkansas
Opinion delivered May 6, 2004

*Phillip A. McGough, P.A.*, for appellant.

*Mike Beebe*, Att'y Gen., by: *Brad Newman*, Ass't Att'y Gen., for appellee.

A NNABELLE CLINTON IMBER, Justice. Appellant Daniel Nobice Peters was convicted of kidnaping, rape, and residential burglary, and was given two life sentences for the kidnaping and rape convictions, and forty years' imprisonment for the residential burglary conviction. The sentences were ordered to be served consecutively. Mr. Peters appeals his convictions on the sole ground that a statement by a State's witness regarding a missed polygraph appointment was highly prejudicial and the trial court erred in not granting a mistrial. We disagree and affirm the convictions. Because Mr. Peters

was sentenced to life in prison, we have jurisdiction over this appeal pursuant to Ark. Sup. Ct. R. 1-2(a)(2).

At trial, the prosecution's first witness was Chief Robert Drake of the Stamps Police Department. Chief Drake testified about how the victim's car, which had been stolen by her assailant, was found in Louisiana approximately eighteen months after the crimes occurred. Police had questioned a witness, who identified Mr. Peters from a photo lineup as the man who was in possession of the victim's car outside a Louisiana night club. During his testimony, the following colloquy took place between the prosecutor and Chief Drake:

> Q. I ask you, did an initial interview took [sic] place and Mr. Jones questioned [Mr. Peters] about a stolen car?
>
> A. Yes, sir.
>
> Q. And I want to know what actually was asked about the car that was recovered in Louisiana and if he had any statements to make about that?
>
> A. His statement was that he didn't rape Ms. Hardeman.
>
> Q. So, he's asked about a stolen car, and his first response was, "I didn't rape Ms. Hardeman"?
>
> A. Yes.
>
> [Defense counsel]:
>    Wait a minute. I object. And again, that's not what he said. He said that was his statement. He came back and said his first statement was. He's in effect testifying for the chief there.
>
> Q. What was his response to finding the car stolen and recovered in Louisiana?
>
> A. "I didn't rape Ms. Hardeman."
>
> Q. Was that responsive to the question asked?
>
> A. No.

Q. Now, did Mr. Peters at that time offer anything to you [to show] whether he may be innocent of this rape charge?

A. No.

Q. He didn't offer you any blood?

A. Excuse me?

Q. He didn't offer to give you blood?

A. Oh, yes, sir. After Mr. Jones and him talked a little bit more, uh, he, I had already had a polygraph set up for him on February 14th, and he did not show for it, so . . .

[Defense counsel]:
    I object. If the Court please, may we approach the bench?

At this point, defense counsel moved for a mistrial, and a lengthy discussion took place between the court and attorneys from both sides. Defense counsel argued that, when the polygraph reference was immediately preceded by the statement that Mr. Peters had denied raping Ms. Hardeman, and it was coupled with the fact that Mr. Peters missed the scheduled polygraph appointment, the only conclusion the jury could possibly come to was that Mr. Peters missed the appointment because he was guilty and was afraid of failing the polygraph.

Extensive discussions on the motion for mistrial took place between the court and counsel that afternoon and the next morning. The trial court admonished the jury that polygraph tests are inadmissible and should not be considered for any reason. Then the trial court, without objection, polled the jurors individually in chambers, and each juror responded that he or she had drawn no inference from Chief Drake's statements. The trial court instructed the jury to disregard the statement about the scheduled polygraph test, and denied the motion for mistrial.

During the trial, the victim was unable to identify Mr. Peters as her attacker. However, another prosecution witness, Ms. La-Condra Stephens, made an in-court identification of Mr. Peters as the man who had been in possession of the victim's car in Louisiana. Forensic DNA evidence matched Mr. Peters's DNA to

semen on a vaginal swab taken during the victim's rape exam. Furthermore, the jury heard testimony that the probability of a random individual from the black population having the same genetic markers as those identified in the DNA sample on the vaginal swab were approximately 1 in 3 billion. The jury returned verdicts of guilty on all charges.

Mr. Peters's argument on appeal mirrors the argument made at trial. Specifically, he contends that a mistrial was warranted because, confronted with Chief Drake's statement that Mr. Peters missed his scheduled polygraph test, the jury could have only come to the conclusion that Mr. Peters was afraid the polygraph test would show he was guilty. Mr. Peters contends that testimony about polygraph tests is inadmissible because polygraphs are considered unreliable and prejudicial. Chief Drake was the State's first witness; thus, Mr. Peters contends the prejudice caused by the statement about the polygraph was substantial in that it colored the remainder of the trial.

Mr. Peters further contends the long discussions about the motion for mistrial that were held out of the hearing of the jury, and the polling of the jury, even more impressed upon the jury's minds the importance of Chief Drake's statement. Mr. Peters concludes that the prejudicial nature of the statement coupled with all the attention given it so prejudiced the jury that he should have been granted a mistrial.

■■ A mistrial is a drastic remedy, to be employed only when an error is so prejudicial that justice cannot be served by continuing the trial, and when it cannot be cured by an instruction to the jury. *Walker v. State*, 353 Ark. 12, 110 S.W.3d 752 (2003); *Howard v. State*, 348 Ark. 471, 79 S.W.3d 273 (2002). The decision to grant a mistrial is within the sound discretion of the trial court and will not be overturned absent a showing of abuse or manifest prejudice to the appellant. *Walker v. State, supra; Jones v. State*, 340 Ark. 390, 10 S.W.3d 449 (2000).[1]

---

[1] The dissent criticizes our use of this standard of review, stating that the proper standard is not that of a review of the denial of a motion for mistrial, but that we should have instead analyzed this appeal in light of the denial of a fair and impartial jury. However, *all* motions for mistrial are made due to a belief that the jury is no longer fair and impartial because it has been tainted in some way by prejudicial error. This case is no different than other cases in which motions for mistrial have been denied for such a reason. In support of its

The *results* of polygraph examinations are inadmissible in all Arkansas courts. *See* Ark. Code Ann. § 12-12-704 (Repl. 2003). However, in the instant case, though information regarding a missed polygraph appointment was before the jury, there was no mention of any polygraph result. Therefore, we turn our focus to whether the mention of the missed polygraph appointment itself was prejudicial enough to warrant a mistrial.

Several times, we have dealt with the denial of a request for mistrial when information about a polygraph test has deliberately or inadvertently been elicited from a witness in a jury trial. In *Van Cleave v. State*, 268 Ark. 514, 598 S.W.2d 65 (1980), we stated that any reference to a polygraph test, in the absence of an agreement or other justifiable circumstances, normally constitutes prejudicial error. Nonetheless, we held the trial court did not err in denying Van Cleave's motion for mistrial, because the defense had not made a timely objection when reference had been made to a witness's polygraph test.

In *Roleson v. State*, 272 Ark. 346, 614 S.W.2d 656 (1981), we held that it was an abuse of discretion to deny a motion for mistrial when a witness referred repeatedly to her polygraph exams, in an attempt to bolster her assertion that she had been truthful from the time she took the polygraph. The defense timely objected to each reference, but the trial court refused to entertain the objections. *Id.*

■■ However, in *Wingfield v. State*, 303 Ark. 291, 796 S.W.2d 574 (1990), we concluded that our holdings in *Van Cleave, supra,* and *Roleson, supra,* were overbroad:

> [We] take this opportunity to clarify our position on references to polygraph examinations. While neither the results of a lie detector examination nor testimony that indirectly or inferentially apprises a jury of the results of a lie detector examination are admissible, the fact that the jury is apprised that a lie detector test was taken is not necessarily prejudicial *if* no inference as to the result is raised or *if* any inferences that might be raised as to the result are not prejudicial. *See Johnson v. Florida*, [166 So.2d 798 (Fla. 1964)]. [Emphasis in original.]

argument, the dissent cites to two cases in which defendants were denied fair and impartial juries *from the outset* because the makeup of the jury panel was tainted when qualified jurors were stricken and not allowed to serve on the panel. Such an analysis is not triggered here, where there has been no challenge to the impartiality of the jury that was chosen, and the only challenge is that the jury heard evidence that could have, but did not, taint it.

> Consequently, a witness's veracity cannot be bolstered or discredited by proof of his taking *or refusing* a lie detector test, and evidence of a witness's *willingness or reluctance to be examined* is also prejudicial and inadmissible to prove consciousness of innocence or of guilt. *Id.* [Emphasis added.]

*Wingfield v. State*, 303 Ark. At 296-97, 796 S.W.2d at 576.

We referred to *Wingfield* recently, in *Ferguson v. State*, 343 Ark. 159, 33 S.W.3d 115 (2000), when we held that a trial court did not abuse its discretion by denying a mistrial:

> Under the circumstances, Appellant has failed to demonstrate that the trial court abused its discretion by denying the mistrial. The witness's remarks were spontaneous and obviously not solicited by the prosecution. *More importantly, there was no prejudicial inference from the witness's remarks, as it was not evident from her testimony how Appellant scored on the test.* This court has held that "the fact that the jury is apprised that a lie detector test was taken is not necessarily prejudicial *if* no inference as to the result is raised or *if* any inferences [that] might be raised as to the result are not prejudicial."

*Id.* at 177-78, 33 S.W.3d at 127 (citing *Wingfield v. State, supra*) (emphasis added).

After Chief Drake's referral to the missed polygraph appointment, Mr. Peters moved for a mistrial, stating that the statement was inadmissible, non-responsive, and so prejudicial that it could not be corrected. The prosecutor agreed that the statement was non-responsive, but asked the trial court to cure the error with a cautionary instruction to the jury. The prosecutor pointed out that Chief Drake's statement made no reference to polygraph results — only that a polygraph had been scheduled and Mr. Peters had missed the appointment.

Defense counsel told the trial court that he was concerned an admonition would draw more attention to the polygraph remark, but stated, "I'm not saying I'm asking the court not to give a cautionary instruction." The prosecutor admitted that "the very mention of it is certainly highly prejudicial." The prosecutor went on to argue a cautionary instruction was enough, because, "there's no evidence of what happened, he hasn't even said the guy didn't take it and pass it."

On appeal, Mr. Peters argues that this case is distinguishable from *Wingfield v. State, supra*, because the jury would infer that the

missed polygraph appointment meant he was guilty and, therefore, it was as prejudicial as telling a jury that he had failed a polygraph. Indeed, he frames his argument,

> [T]he mention of the appellant's missing a scheduled polygraph examination, without further explanation, leads to the inference that he missed it because of guilt. Why would he have missed the polygraph appointment if he were innocent?

In other words, Mr. Peters argues that the jury had to have drawn a negative inference from Chief Drake's statement; and yet, the jurors themselves, when polled without defense objection, told the trial court that they had drawn no inference from Chief Drake's statement. The dissent agrees with Mr. Peters and believes the "obvious inference" arising from Chief Drake's testimony is that Mr. Peters missed his polygraph appointment because of "a consciousness of guilt." However, considering that the jurors affirmed that they had drawn no inference from the remarks about the polygraph, the dissent must either be arguing that the mention of a missed polygraph appointment is *per se* prejudicial, or the dissent must believe the jurors were prejudiced even though they said they had drawn no inference from the remarks.

■ Furthermore, the dissent refers to the "mention of Peter's reluctance" to take the test, and yet reluctance was not itself mentioned, but was just one possible inference one could draw from a missed polygraph appointment, and the jurors drew no such inference. Certainly, willingness or reluctance to take a polygraph is prejudicial according to *Wingfield, supra,* and is inadmissible "to prove consciousness of innocence or of guilt." However, the jurors did not infer reluctance, and the prosecution did not deliberately elicit the polygraph reference or use it in any way to prove consciousness of innocence or of guilt, even assuming that one can draw from a missed appointment the conclusion that Mr. Peters was reluctant to take the polygraph. Considering the myriad reasons people miss appointments, such a conclusion is not warranted by the mere mention that Mr. Peters had missed a polygraph appointment.

In fact, the record shows that Mr. Peters himself provided the jury with another possible reason for missing the appointment, as shown from a colloquy between Mr. Peters and his counsel during his direct examination:

Q. So you lied to him about the car?

Q. Why did you do that?

A. Like I said, I wasn't tryin' to get locked up. I mean, I'm only just keepin' it, just bein' real about it. Ain't nobody tryin' to go to jail. Even though I know I'd messed up, but I wasn't just fixin' to say, "Well, okay, here."

Q. All right, but the point is, you didn't tell him the truth?

A. Right.

Q. Now, what happened next, if anything, that's of any importance to this case?

A. Well, uh, Officer Drake at that date *set up an appointment for me and him.*

Q. Now, wait a minute. Wait a minute.

At this point, defense counsel asked to approach the bench and, at the bench, the court asked him, "About to cure our half day mistrial motion?" Obviously, the "appointment" to which Mr. Peters was referring was the appointment for the polygraph. Defense counsel asked to be able to instruct his client not to mention the polygraph and the trial court allowed him to do so. The direct examination continued:

Q. I think I forgot where we were in the chronology of events, but I think you had been interviewed by Chief Drake in February of 2002, and you had related the events with the victim's car as of March of 2001. Is that right?

A. Right.

Q. And then after that interview in 2002 with Chief Drake, when approximately was the next time anybody wanted to talk to you about it? State wise?

A. Chief Drake the same day. He wanted to talk to me later on that week. That's what I was fixin' to tell you.

Q. All right.

A. Right. I did.

A. He came and he told me, or he said, "I'm gonna come through the neighborhood later on today. If I see you I'll tell you what time." He came by later on that evening. I was standing by the dairy, you know. He said Thursday at 1:00. I want, you know what I'm sayin', I want to talk to you again. I said, "Okay. Fine."

Q. *So you were there? Did you go there?*

A. *Did I go that Thursday?*

Q. *Yes.*

A. *No.*

Q. *Why not?*

A. *Well, because he already told me that the reasons he, you know what I'm sayin', he'd already told me that it wasn't necessary and it didn't hold any value. So, I wasn't really obligated anyway.*

Q. *You didn't feel like you had to show up?*

A. *Naw, really, I didn't. He'd already told me that. So, I just uh, at the time uh, some more stuff came up, so I left town. But it was unrelated to this though.*

■ It is clear to us that this colloquy concerned the missed polygraph appointment, and Mr. Peters gave the jury another possible reason why he missed the appointment — because Chief Drake told him it wasn't necessary for him to be there and the polygraph "didn't hold any value." It is a far leap for Mr. Peters to say the jury heard this perfectly plausible reason for missing a polygraph appointment and would still believe the only possible reason for missing it was fear of failing it.

■ In the case of *Bradley v. State*, 320 Ark. 100, 896 S.W.2d 425 (1995), we held that it was not an abuse of discretion when a trial court refused to grant a mistrial after the prosecutor improperly commented on the defendant's failure to testify. Such references to a failure to testify violate the Fifth Amendment privilege against self-incrimination, but such error can be harmless if it is shown beyond a reasonable doubt that the error did not influence the verdict. *Id.* at 105, 896 S.W.2d at 428 (citing

*Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d. 705 (1967)). In *Bradley,* we held that the prejudicial remarks by the prosecution were harmless error because the evidence of the defendant's guilt was overwhelming. *Id.*

Here, we do not believe that Mr. Peters has shown prejudice, because only a negative inference of guilt or reluctance could be prejudicial, and the jurors declared that they had made no such inference. Furthermore, the trial court took care to give a cautionary instruction to the jury regarding Chief Drake's remarks. Nonetheless, even assuming prejudice could be shown as a result of the polygraph reference, here, as in *Bradley v. State, supra,* the evidence of guilt was overwhelming. If we excise Chief Drake's improper remarks, as we did in *Bradley,* we are still left with substantial evidence of Mr. Peters's guilt. Michael Norwicki, a forensic biologist with the Arkansas State Crime Lab, testified that Mr. Peters's DNA matched that on the vaginal swab taken from the victim, and the probability that the DNA came from another random individual from the black population was approximately one in three billion. In addition, the victim's car was stolen by her assailant after the attack, and Mr. Peters was identified by LaCondra Stephens as being in possession of that car approximately a month after Ms. Hardeman was raped. There was evidence that Mr. Peters knew the victim from work and had once asked her, "Where you been all my life?" On another occasion, when the victim was present, Mr. Peters commented to one of her coworkers, "Hey, man, why didn't you tell me this good lookin' woman stayed down there by you."

It is clear that the jury heard evidence that Mr. Peters knew who the victim was, knew where she lived, was seen in her stolen automobile a short period of time after the attack, and was a positive "one out of three billion" DNA match to the rapist. The dissent states that "the evidence received later could not alter the inference that Peters argued he was innocent but was unwilling to prove it." Yet, if Chief Drake had never made the remark about the polygraph, there would still have been overwhelming evidence of Mr. Peters's guilt. Chief Drake's comment, even if one could make a negative inference from it, does not negate the remainder of the evidence presented to the jury.

■■ Mr. Peters has argued that the only inference the jury could have made was that he was afraid to take the polygraph exam because he was guilty, and that such an inference was prejudicial. On the facts of this case, we hold that Mr. Peters has

not met his burden of showing the jury was prejudiced in any way by Chief Drake's referral to the missed polygraph exam. Moreover, even if prejudice could be presumed from the polygraph remarks, any error caused by that prejudice was harmless in view of the overwhelming evidence of Mr. Peters's guilt. Accordingly, we hold that the trial court properly denied the motion for mistrial. As the denial of the motion for mistrial was the sole point on appeal, the convictions for rape, kidnaping, and residential burglary are affirmed. The record has been reviewed for other reversible error, as required by Supreme Court Rule 4-3(h), and none has been found.

Affirmed.

THORNTON and HANNAH, JJ., dissent.

RAY THORNTON, Justice, dissenting. I respectfully dissent on the basis that neither the results of a lie-detector examination nor testimony that indirectly or inferentially apprises a jury of the results of a lie-detector examination are admissible. *Wingfield v. State*, 303 Ark. 291, 796 S.W.2d 574 (1990). There is an exception when there is no inference as to the result, or when any inferences are not prejudicial. *Id*.

In the case now before us, I believe that the testimony of Robert Drake, which referred to the fact that appellant "did not show [up] for" a previously scheduled polygraph examination, supports an inference that appellant feared he would fail the test. Based on this improper testimony, the trial court should have granted a mistrial. Accordingly, I would reverse the trial court and remand the case for a new trial.

JIM HANNAH, Justice, dissenting. I respectfully dissent. The majority errs in analyzing Police Chief Robert Drake's improper testimony by determining whether Peters showed that he was prejudiced by the testimony.[1] The court's analysis is improper in this case involving the right to a fair and impartial jury. The majority's error arises from applying the standard to be met by a criminal defendant for reversal from mistrial cases when the correct standard is to be taken from cases discussing the right to an impartial jury.

---

[1] I note that Police Chief Drake's answers were non-responsive to the prosecutor's questions. I appreciate the effort of the trial judge to correct the problems created by Police Chief Drake's testimony; however, it is not an error that could be cured by the trial judge.

Reversal by this court is required because the trial court failed to grant the mistrial sought when Peters' right to a fair and impartial jury was denied him by Drake's improper testimony. This court may not now look through all the proceedings that followed the refusal to grant the mistrial to speculate on whether Peters was actually injured by the improper testimony. The after the fact events in no way cure the denial of a fair and impartial jury. The discussion of the majority about statements from jurors is irrelevant and in error.

The majority's decision is based on a failure of Peters to show that he was prejudiced. If this case only involved a mistrial issue, I would agree. That is not the case. At issue is the impartiality of the jury, an issue that may not be put to rest by rummaging through the record searching for events occurring after the improper testimony. The trial court erred in refusing to grant a mistrial where the defendant's right to an impartial jury was impaired, and the trial court must be reversed to preserve the rule of law. The cite to *Bradley v. State*, 320 Ark. 100, 896 S.W.2d 425 (1995), is misplaced. A refusal to testify by a criminal defendant, as discussed in *Bradley*, while somewhat analogous to the implication of not showing up for the polygraph out of a consciousness of guilt, does not discuss the issue of the right to an impartial jury. As this court very recently stated:

> A defendant's Sixth Amendment right to a fair trial before an impartial jury is a fundamental element of due process. *U.S. v. Crow Dog*, 532 F.2d 1182 (8th Cir. 1976) (*Citing Singer v. United States*, 380 U.S. 24, 85 So. Ct. 783, 13 L.Ed2d 630 (1965); *In re Murchison*, 349 U.S. 133, 75 S.Ct. 623, 99 L.Ed 942 (1955); *United States v. McNally*, 485 F.2d 398 (8th Cir. 1983) (cert. denied 415 U.S. 978, 94 So. Ct. 1566, 39 L.Ed2d 874 (1974).

*Elmore v. State*, 355 Ark. 620, 144 S.W.3d 278 (2004). Police Chief Drake was the first witness, and his improper testimony tainted Peters's trial from its beginning. Peters was denied his fundamental right to a fair and impartial jury. Where the issue is one of whether the right to a fair and impartial jury has been violated, it is not necessary for the criminal defendant to "demonstrate exactly how he was prejudiced; rather, he only needed to prove that there was a reasonable possibility of prejudice." *State v. Cherry*, 341 Ark. 924, 931, 20 S.W.3d 354 (2000)(citing *Larimore v. State*, 309 Ark. 414, 833 S.W.2d 358 (1992)). Where from the beginning of a trial, a criminal defendant "was not clothed with one of the constitutional benefits afforded all

defendants in a criminal case, a right to a fair and impartial jury," the case should be reversed. *Allard v. State,* 283 Ark. 317, 675 S.W.2d 829 (1984). *See also Elliott v. State,* 335 Ark. 387, 984 S.W.2d 362 (1998).

It is improper to analyze the claim of the failure to provide a fair and impartial jury by resorting to the record to try and discern if the outcome of the case was really changed by the improper testimony. In *Mitchell v. State,* 295 Ark. 341, 750 S.W.2d 936 (1988), the issue was whether Mitchell was denied his right to a fair and impartial jury by the exclusion of the only black juror. The State argued that the evidence of guilt was overwhelming, and the case should be affirmed. This court correctly stated:

> In this situation, however, the guilt or innocence of Lonnie Mitchell is not the sole issue. We are concerned here with prejudice to the system of justice. The possibility that a juror was struck for discriminatory reasons is the possibility that the prospective juror concerned, all citizens, and the very system of justice have been deprived of fundamental constitutional protection to which they are entitled.

*Mitchell,* 295 Ark. at. 350. This court in *Mitchell* went on to cite *Gray v. Mississippi,* 481 U.S. 648 (1987), and stated:

> In *Gray v. Mississippi,* 107 S.Ct. 2045 (1987), the Supreme Court held that it was improper to have allowed the prosecution to strike for cause a prospective juror who was qualified. The Mississippi Supreme Court had affirmed the conviction because the trial judge had admitted he had required the prosecution to use peremptory challenges against jurors subject to challenge for cause due to their opposition to the death penalty, and thus he was only correcting his previous mistake. In response to the argument that the error was harmless, the Supreme Court stated that "because the impartiality of the adjudicator goes to the very integrity of the legal system, the. . . harmless error analysis cannot apply. We have recognized that 'some constitutional rights [are] so basic to a fair trial that their infraction can never be treated as harmless error.' " The same rationale applies here. The right to a jury selected free of the taint of racial discrimination is so fundamental that it cannot be described as harmless error.

*Mirchell,* 295 Ark. at 351.

Thus, the majority's analysis is simply wrong. The impartiality of the adjudicator was prejudiced, and the prejudice goes to the very integrity of the legal system. The trial court erred in denying the motion for mistrial and must be reversed.

Until this decision, the law in Arkansas was correct. The law was that the mention of a polygraph test in trial, that gives rise to an inference that the criminal defendant was under a consciousness of guilt, was prejudicial and required reversal. Under the majority decision, appellate review is now reduced to gleaning the record to see if the jury was presented with any other explanation other than consciousness of guilt. We ought to be deeply concerned about an increasing tendency to default to harmless error when the going gets tough and it looks likely that the right person was prosecuted. The primary function of the judicial system is to preserve the rule of law. *McCoy v. State*, 354 Ark. 322, 123 S.W.3d 901 (2003) (Hannah, J., concurring) (citing *Alexander v. State*, 268 Ark. 384, 598 S.W.2d 395 (1980) (Fogleman, J., concurring)).

The majority's analysis in this case begs the question of whether the trial court erred in refusing to grant the motion for mistrial during Police Chief Drake's testimony. Drake told the jury that Peters spontaneously asserted that he did not rape the victim, and that he failed "to show up" for a polygraph test. The obvious inference arising from this testimony is that Peters failed to appear for his polygraph test because of a consciousness of guilt. Such an inference is prejudicial, and the "trial court abused its discretion in denying . . . [the] motion for a mistrial." *Wingfield v. State*, 303 Ark. 291, 297, 796 S.W.2d 574 (1990). The admonition to the jury regarding admissibility of the evidence "did not cure the prejudice. . . ." *Id.* Allowing additional references to the polygraph tests "compounded the error." *Id.*

The prohibition against the admission of the results of polygraph tests extends also to the "willingness or reluctance to be examined as evidence of consciousness of innocence or guilt." *Ramaker v. State*, 345 Ark. 225, 234, 46 S.W.3d 519 (2001). What is at issue in this case is not simply the mere mention of the test, the results, or even the mere mention of reluctance to submit to the test.[2] The majority asserts that I err in mentioning reluctance to appear at the polygraph test because "there was no mention of reluctance whatever." By any common sense understanding, Drake's testimony that Peters asserted he did not rape the victim and then failed to show up for an appointment to take a polygraph test implies that he did not wish to be there, or in other words, that

---

[2] Under *Ramaker*, I believe that the case might well be reversed based upon mention of Peters's reluctance to submit to the test. However, we need not engage in that analysis because far more than mention of reluctance is at issue in the present case.

at the least, he was reluctant. The majority's focus on something as inconsequential as the use of the word "reluctance" only illustrates the weakness of the majority's position. Rather, at issue is whether this court will allow the prosecutor to introduce evidence that a criminal defendant failed to submit to a polygraph test because of a consciousness of his or her guilt. A prosecutor shall not be allowed to comment on a criminal defendant's silence. *Jarreau v. State*, 291 Ark. 60, 722 S.W.2d 565 (1987); *Clark. v. State*, 256 Ark. 658, 509 S.W.2d 812 (1974). The majority's holding comes perilously close to allowing just that through use of testimony about the failure to show up at an arranged polygraph test.

The evidence of the polygraph test in the case before us is substantially more prejudicial than in *Wingfield*, and yet under a perfunctory "no harm, no foul" analysis, the majority affirms the trial court. In *Wingfield*, the trial court committed reversible error by failing to grant a motion for mistrial when there was testimony that a State's witness had taken a polygraph test and passed it. In the present case, the prejudicial evidence of the polygraph test did not bolster a witness's testimony. It raised an inference that Peters, by failing to "show up" for the test, admitted he was guilty of rape.

Aside from the highly prejudicial nature of the inference raised by Chief Drake's testimony, we ought to note that the evidence of the missed polygraph test in this case was delivered by the first witness. Doubtless this first witness in a rape and kidnapping case made a lasting impression on the jury as it commenced its difficult job in a very serious case. Moreover, the first witness was a law enforcement officer, the chief of police. The jury thus heard from a person in a high position of authority that Peters professed his innocence and then failed to show up for the test to prove it.

Drake's testimony may be summed up as recounting that Peters spontaneously declared that he did not rape the victim followed almost immediately by testimony that a polygraph test was set up for Peters, but "he did not show up for it . . ." The clear implication was that Peters was guilty or he would have shown up. We also may not ignore the words chosen by Drake. The words were not neutral. The use of "did not show up," implies a reluctant person and implies guilt. This court has noted in its recitation of facts in past cases that someone failed to show up for polygraph tests. *See e.g., Dyer v. State*, 343 Ark. 422, 428, 36 S.W.3d 724 (2001), where this court stated, "Swim was scheduled to take a polygraph examination regarding Dyer's murder; he never showed." Along with other evidence, this fact of a failure to

show up for the polygraph test implied that Swim murdered Dyer. A failure to show up in life is not a good thing. For example, the failure of an attorney to show up at a crime scene inspection was argued to be ineffective assistance of counsel. *Dansby v. State*, 350 Ark. 60, 84 S.W.3d 857 (2002). The failure to show up at trial expresses a lack of respect for the judicial system. *Florence v. Taylor*, 325 Ark. 445, 928 S.W.2d 330 (1996). Stating that Peters "did not show up," implied there was a reason he did not show up, and it was because he was guilty.

Drake's testimony simply may not be glossed over by reference to other evidence from which the jury might have concluded Peters had other reasons than a feeling of guilt that kept him from the polygraph test. Drake's testimony implied that Peters did not show up at the polygraph test because of consciousness of guilt. That is not permissible under the law, or at least it was not until this court's decision in this case.

I am concerned that the majority is making fundamental changes in the law without realizing it. Under *Wingfield, supra,* and *Ferguson v. State,* 343 Ark. 159, 33 S.W.3d 115 (2000),[3] the mere mention of a polygraph test or the results is no longer *per se* prejudicial, but rather must be shown to be prejudicial. In this case, clear prejudice is shown but ignored by the majority. Citing *Wingfield, supra,* this court in *Misskelley v. State,* 323 Ark. 449, 915 S.W.2d 702 (1996), noted that what the legislature and the courts have sought to avoid is "the likelihood of credibility determinations being made by reference to the unreliable results of a polygraph examination." *Misskelley,* 323 Ark. 449, 474, 915 S.W.2d 702 (1996). What is of concern is that the jury will make credibility determinations based on facts such as Peters's failure to appear for the arranged polygraph test. That is precisely the harm inflicted by Drake's testimony, which until this opinion, was prejudicial and under *Wingfield, supra,* would have resulted in reversal.

I also note that the trial court's attempt to cure the prejudice was ineffective, and if anything, simply made matters worse. *Wingfield, supra.* Defense counsel was understandably reluctant to ask for a cautionary instruction because repeated reference to the

---

[3] Citing *Wingfield,* this court in *Ferguson v. State,* 343 Ark. 159, 33 S.W.3d 115 (2000), considered mention of a polygraph test with no reference to the result. The trial judge's denial of the motion for mistrial was not found to be an abuse of discretion. That is consistent with *Wingfield.* In *Ferguson,* there was only reference to the fact a polygraph had been taken.

failure to appear for the polygraph test would only make his client appear more guilty. The cautionary instruction likely reinforced Drake's testimony in the minds of the jury. Likewise, the individual questioning of jurors by the trial court that followed the next day likely further reinforced and emphasized Drake's testimony that the failure to appear at a scheduled polygraph test was an admission of guilt.

The trial court erred when it failed to grant the motion for mistrial during Drake's testimony. The evidence that was received later could not alter the inference that Peters argued he was innocent but was unwilling to prove it. The majority also makes a perilous assumption that the evidence in this case relied upon by the majority would have come in as it did had Chief Drake not mentioned Peters's failure to show up for the polygraph test. The discussion by the majority of other plausible reasons for Peters's nonappearance at the polygraph test that might be deduced from the evidence offered at trial simply ignores the real question of whether the trial court erred in denying the motion for mistrial.

We have before us a case in which two life sentences were imposed. The conduct alleged no doubt merits the sentences. The evidence against Peters is ponderous. However, guilt and sentences imposed are issues for the jury to decide when the issues are properly presented to the jury. The right to a fair and impartial jury has been denied in this case, and it is our duty to the law to reverse the jury's decision and remand the case to be retried even if the outcome in the case may be the same. New law on admission of facts surrounding polygraph tests is created by this case. The opinion of a court of appeals case of more than twenty years ago accurately sets out my concern:

> The saying, "Bad cases make bad law" can all too often be a reality unless our courts apply the law evenly as well as knowledgeably. One's inclination might be to "stretch" or "create" law to assure that justice is done in every case. Such a proclivity, once indulged, might prove to foster justice in one case but prove disastrous in the next.

Cooper v. Indus. Prods. v. Meadows, 5 Ark. App. 205, 211, 634 S.W.2d 400 (1982).

I must respectfully dissent.