2010 Ark. App. 524

**Paul Douglas GILL, Appellant**

v.

**STATE of Arkansas, Appellee.**

**No. CA CR 09–368.**

Court of Appeals of Arkansas.

June 23, 2010.

Dale E. Adams, Montgomery, Adams & Wyatt, PLC, Little Rock, AR, for appellant.

Dustin McDaniel, Atty. Gen., Valerie Glover Fortner, Asst. Atty. Gen., for appellee.

RITA W. GRUBER, Judge.

In the very late morning of March 22, 2007, Paul Douglas Gill telephoned 911 to report that he had discovered his wife dead of a gunshot wound at their home in Fordyce, lying in their bed in a pool of blood. Sandra Kaye Gill was the fourth wife of Mr. Gill, who had been a staff sergeant in the National Guard and Fordyce's Chief of Police. Mr. Gill was charged on August 2, 2007, with her capital murder and with committing the felony with a firearm. He was convicted by a jury of first-degree murder and the firearm charge, and was sentenced to forty years' imprisonment. He now appeals, raising four points. First, he contends that the evidence was not sufficient to support the verdict. He also contends that the trial court erred by allowing articles of clothing to be introduced into evidence, allowing the testimony of his third wife, and refusing to grant a mistrial. We affirm.

### I. *Sufficiency of the Evidence*

The intent necessary for first-degree murder may be inferred from the type of weapon used, the manner of its use, and the nature, extent, and location of the wounds. *Walker v. State,* 324 Ark. 106, 918 S.W.2d 172 (1996). A person commits first-degree murder if "[w]ith a purpose of causing the death of another person, the person causes the death of another person." Ark.Code Ann. § 5–10–102(a)(2) (Repl.2006). A criminal defendant's intent or state of mind is seldom capable of proof by direct evidence and must usually be inferred from the circumstances of the crime. *Leaks v. State,* 345 Ark. 182, 45 S.W.3d 363 (2001). It is within the province of the trier of fact, not the reviewing court, to weigh the evidence and assess the credibility· of witnesses. *Harmon v. State,* 340 Ark. 18, 8 S.W.3d 472 (2000). Moreover, inconsistent testimony does not render proof insufficient as a matter of law. *Id.*

Mr. Gill moved for a directed verdict at the conclusion of the State's evidence and again at the close of all the evidence. On appeal he repeats the arguments he made below, that the unconnected circumstantial evidence did not show whether his wife's death was suicide or homicide, nor did it show beyond a reasonable doubt that he killed her. He does not dispute that law enforcement officers found her body on its left side when they arrived, his .38 Special Smith & Wesson tucked under her left arm and the holster behind her. But he

points out that there was conflicting evidence on whether the crime scene had been manipulated. He notes that the cause of death remained "undetermined" for several months and that the time of death was calculated as anywhere from 2:30 a.m. until 7:00 a.m. He alleges that police "botched" physical evidence when sheets and pillows taken from the scene were thrown into the coroner's dumpster and not retrieved for days, no tests for gunshot residue were performed on Mr. or Ms. Gill's hands, and testing was not done on the contents of her stomach. He asserts that the State did not prove that on the day of the murder he wore the plaid shirt and blue jeans alleged to be his, on which fine particles of gunshot residue were found. He notes testimony of expert witness Zoe D'Aoust, a criminologist at the state crime laboratory, that anyone around a gunshot victim could get residue particles on themselves; that not "a lot of stock" was put on particles' location on clothing because they move around; and that police usually threw everything together in a bag, with an unknown manner of handling the items. He points out that the two neighbors who heard a gunshot attributed the sound to unrelated causes.

A motion for directed verdict is a challenge to the sufficiency of the evidence. *Ross v. State*, 346 Ark. 225, 57 S.W.3d 152 (2001). The test for determining the sufficiency of the evidence is whether substantial evidence, direct or circumstantial, supports the verdict; substantial evidence is evidence of sufficient certainty and precision to compel a conclusion one way or another and pass beyond mere suspicion or conjecture. *Id.* On appeal, the evidence is reviewed in the light most favorable to the appellee and only the evidence supporting the verdict is considered. *Id.* Guilt can be established without eye-witness testimony, and evidence of guilt is not less because it is circumstantial. *Id.*

Overwhelming evidence of guilt is not required in cases based on circumstantial evidence, and the test is one of substantiality; to be substantial, the evidence must exclude every reasonable hypothesis other than the guilt of the accused. *Id.* The question of whether the circumstantial evidence excludes every hypothesis consistent with innocence is for the jury to decide; the reviewing court must determine whether the jury resorted to speculation and conjecture in reaching its verdict. *Id.*

The State's witnesses whose testimony was pertinent to the first issue included criminal investigator Brad Mahue of the Fordyce Police Department, Fordyce Patrol Sergeant Scott Hornaday, and Deputy Cary Dunn of the Dallas County Sheriff's Department, who all responded to the 911 call. Testimony was also given by Arkansas State Police Special Agent Rick McKelvey, who handled the investigation, and Dallas County Coroner Tom Tidwell, who pronounced death at 12:51 p.m. and observed that rigor mortis had set in. Neighbors William Lyon and Brooke Turner each testified to hearing a single shot between 3:00 and 3:30 a.m. that morning. Lyon attributed it to deer poaching, and Brooke thought a missile was being fired at Camden. Brooke's dogs raced across the yard to the Gills' property, where Mr. Gill's dogs were barking and "going crazy." Tom Bevel, a blood-splatter expert and crime-scene reconstructionist who reviewed crime-scene photographs and the autopsy report, opined that stippling of gun powder around the entry wound indicated the shot had been fired from "some distance" away. Patterns of blood flow on the victim and the weapon, her position in bed, and the position of the gun in relation to her arms led him to conclude that some-

one had manipulated the gun after the shot was fired.

Defense witnesses disputed Bevel's conclusion about the evidence at the crime scene and the post-mortem blood flow. Forensic pathologist Dr. Robert Bux testified that the cause of death was "undetermined" and—because of insufficient physical evidence and the way it had been handled—could not be determined to be homicide or suicide. He opined that the victim was seated "when she shot herself" and then rolled or fell, and he said that the vast majority of qualified people would conclude that the cause was undetermined. But he clarified that he could not testify that the death was a suicide or homicide. Paul Erwin Kish, an expert in blood-stain-pattern analysis, reviewed crime-scene images and physical evidence including bed pillows, bed linens, and the gun. He saw nothing inconsistent with the gun's position creating the stain patterns and blood-flow pattern, and he said the revolver's grip had insufficient characteristics to show that the blood on the victim's arm was transferred from the grip.

Brandy Gunn, Kaye Gill's only biological daughter, testified that the women talked regularly on the telephone and that both worked at Ouachita County Medical Center, where Ms. Gill directed the nursing home. Gunn described her mother as "so excited" the week before her death after learning that the Gunns were trying to have a baby.

Irene Porcha, a classmate of Ms. Gill in a master's counseling program, testified that after class the night before her death, they talked about upcoming exams and made plans to get together. There was testimony from Ms. Gill's workplace supervisor, Teresa Roark, that Ms. Gill was thrilled to be back in school and that the hospital encouraged her endeavor. Roark recounted suggesting that Ms. Gill get a concealed weapons license because of unsavory people in her field work, to which Ms. Gill responded that she hated guns. Ms. Gill's secretary, Barbara Givens, said that Ms. Gill "freaked out" at the suggestion, adamantly saying she did not want "to even touch a gun." Givens characterized Mr. Gill's response as "strange" the morning she telephoned him to tell him that her workplace had no word from her and had learned she had not kept a dentist's appointment; he "stammered around" after a long pause, said he had seen her at 5:45 a.m., and after another long pause he said he would check around.

Meschal Rainbolt, the administrator of the nursing home where Mr. Gill's mother resided, testified that Ms. Gill visited the home before her death and was surprised to learn of a four-month unpaid bill for her mother-in-law's care of more than $10,000. Rainbolt said that Ms. Gill immediately telephoned Mr. Gill, was red-faced and sighing after talking with him, and expressed to Rainbolt her embarrassment, explaining that this was the only monthly bill she expected her husband to take care of.

Several Georgia Pacific co-workers testified that Mr. Gill's behavior was normal the morning of his wife's death, but James Randle testified that Mr. Gill was "strictly business" instead of joking as usual. The supervisor's log at Georgia Pacific showed Mr. Gill's arriving at 5:53 a.m. that day, his latest for a month and outside his average arrival of 4:45 to 5:05.

Mr. Gill testified and confirmed the phone conversation about his mother's bill but described his wife as a very loving person, full of life, and a strong Christian who loved the value of life and other people. He said that she was alive when he got up at his normal 4:30 a.m. the morning of her death; that he stayed home

later than usual, discussing with her for forty-five minutes to an hour how her full-time job and master's studies were causing exhaustion and stress for her; and that he told her it wasn't worth it, but he would help however he could if she wanted to continue the schooling. He testified that he asked before he left for work at 5:45 if she would be okay; she replied, "Yes, I know what I need to do." He testified that he made the five-minute drive back home after receiving the call from her workplace around 11:30. He said that he leaned against the bed when he found Ms. Gill, her face swollen and bruised. He said that he put his hand on her shoulder, began to check her pulse, and felt her cool arm. He added that he could not remember whether he had shaken her because everything went blank. He testified that he thought he had reported that his wife killed herself when he called 911 for police.

Our review of the evidence shows that the State's experts testified the victim was murdered and the crime scene was manipulated before investigating officers arrived. Neighbors heard a shot shortly after 3:00 a.m., and Mr. Gill arrived at work later than usual, at 5:53. There was testimony that Ms. Gill was terrified of guns, that she and Mr. Gill argued about a large unpaid bill the day before her death, that the night before her death she and a classmate planned to study together, and that she anticipated earning a master's degree and having a new grandchild. *Cf. Carter v. State*, 324 Ark. 395, 402, 921 S.W.2d 924, 928 (1996) (focusing on substantial evidence produced by the State and the fact that it disparaged appellant's suicide theory, noting testimony that the deceased did not know how to use a gun and that the presence of the gun in her left hand made a straight shot from right temple to left temple virtually impossible, or exceedingly difficult and unlikely). The evidence in this case, taken as a whole, supports Mr.

Gill's convictions for first-degree murder and using a firearm in committing the offense.

## II. *Chain of Custody*

As his second point on appeal, Mr. Gill contends that the trial court erred in allowing two items of clothing to be introduced into evidence without proof of the chain of custody. Criminologist Zoe D'Aoust confirmed that gunshot residue was found on the clothing.

Evidentiary matters regarding the admissibility of evidence are left to the sound discretion of the trial court, and rulings in this regard will not be reversed absent an abuse of discretion. *Newman v. State*, 327 Ark. 339, 939 S.W.2d 811 (1997). Although the trial court must be satisfied within a reasonable probability that the evidence has not been tampered with, it is not necessary that the State eliminate every possibility of tampering. *Id.* Minor uncertainties in proof of the chain of custody are to be argued by counsel and their weight to be decided by the jury, but they do not render the evidence inadmissible as a matter of law. *Crisco v. State*, 328 Ark. 388, 943 S.W.2d 582 (1997). Proof of chain of custody does not need to be conclusive when an object is subject to positive identification. *Holley v. State*, 2010 Ark. App. 47, at 4, 2010 WL 135187.

Investigator Terrie Smith of the Arkansas State Police testified that he was contacted the day after Ms. Gill's death to "go to a residence" and help retrieve some clothing in Agent McKelvey's case. In a series of objections, Mr. Gill first objected to Smith's testifying to the importance of the clothes. Mr. Gill also seemed to object that he had lacked standing to consent to his clothes being retrieved from another person's house, where he had stayed the night after his wife's death. The prosecu-

tor responded that Smith could be asked what he picked up and whether Mr. Gill consented to have him get the clothes. The trial court, questioning why the prosecutor would "get into consent," ruled that Smith could tell what he did, what he retrieved, where he took the evidence, and what he did with it. Smith then testified that he retrieved a shirt and blue jeans from a Fordyce residence; the State moved that the clothing be introduced into evidence; and Mr. Gill objected to the chain of custody. The trial court ruled that the objection was "a relevant objection at this point subject to [the items] being tied to evidence at a certain point."

The State recalled Agent McKelvey, who testified to the following events. During execution of the search warrant, a conversation occurred with Mr. Gill in his driveway regarding clothes he had been wearing on the day Ms. Gill was found. A woman was with Mr. Gill, and Sergeant Scott Woodward was present with Agent Smith. Mr. Gill said in the conversation he had spent the night at the other lady's house, and he gave permission for the officers to have the clothing. Mr. Gill, the woman, Smith, and Woodward went to the other location. Smith retrieved the clothing and brought it back.

McKelvey identified the shirt and blue jeans at trial as those that Smith had retrieved, but admitted that his report contained nothing about where they came from. Mr. Gill then objected to the introduction of the clothing on the basis of chain of custody, and the trial court noted a gap in the State's proof of who had possession. Mr. Gill argued that McKelvey did not witness the consent, did not go to the house, was testifying to something relayed to him, and had no first-hand knowledge. The trial court overruled the objection, ruling that it went to the weight of the evidence.

On appeal Mr. Gill argues that there were significant gaps in the chain of custody and the State could not properly authenticate the clothing as the pants and shirt Gill was wearing when he found his wife's body, nor could the State account for what had happened to the clothing in the twenty-four to thirty-six hours after they were taken. His latter argument was not made below, and we need not address it. Parties are bound by the scope and nature of their objections as presented at trial, and the reviewing court will not consider arguments, even constitutional ones, raised for the first time on appeal. *Buford v. State*, 368 Ark. 87, 243 S.W.3d 300 (2006). Moreover, McKelvey testified to receiving Mr. Gill's consent to obtain the clothes and asking Smith to accompany Mr. Gill to get them. Smith testified that he had done so, and there was testimony that the shirt and jeans introduced into evidence were the items he had retrieved. There was sufficient evidence identifying the clothes as those Mr. Gill was wearing when he found his wife's body to render the evidence admissible at trial, and we find no abuse of discretion by the trial court in allowing it.

### III. *Testimony of Deborah Walden*

Deborah Walden, Mr. Gill's third wife, testified under subpoena by the State regarding her relationship with him after he was arrested and charged with murder. Walden testified that her employment on the date of Ms. Gill's death was driving a charter bus for a casino line from Little Rock to Tunica. Walden was questioned about trips that she and Mr. Gill made, beginning on April 20, 2007, after the March death. Defense counsel objected that the subject was not relevant or material and was highly prejudicial. The State responded that the testimony went to Mr. Gill's lack of grieving and his character.

The court asked what the testimony had to do with motive, and the State responded: "He's been asking questions of witnesses he was grieving [sic] or he was sad or he was depressed and within a month he's going and taking trips to casinos with his ex-wife." Overruling the objection, the court ruled that it would "take this a question at a time and see where we are." Defense counsel responded he would "have to keep coming back up here and objecting," but he registered no more objections. Walden testified that she and Mr. Gill began a romantic relationship several months after the April trip and had purchased tickets for a cruise before his arrest.

On appeal Mr. Gill argues that Walden's testimony was inadmissible because it was "character assassination" intended to be inflammatory and highly prejudicial, having nothing to do with motive. He relies upon Chief Justice Hannah's dissenting opinion in *Davis v. State*, 362 Ark. 34, 207 S.W.3d 474 (2005), discussing the standard of review for admissibility of character evidence under Arkansas Rule of Evidence 404(b). *See* Ark. R. Evid. 404 (generally prohibiting admission of character evidence for the purpose of proving that he acted in conformity therewith on a particular occasion but allowing under (b) evidence of other acts to show other purposes such as proof of motive).

■■■■ The failure to obtain a ruling on an issue at the trial court level precludes review on appeal. *Kelley v. State*, 375 Ark. 483, 292 S.W.3d 297 (2009). A party cannot change the grounds for an objection or motion on appeal but is bound by the scope and nature of the arguments made at trial. *Rodgers v. State*, 360 Ark. 24, 199 S.W.3d 625 (2004). Mr. Gill did not object to Walden's testimony under Rule 404(b), nor did he obtain such a ruling.

Accordingly, the 404(b) issue is not preserved for our review.

■■■■ Nor do we find that the evidence's probative value was substantially outweighed by any prejudice. Mr. Gill notes in his brief that "any circumstance that ties a defendant to the crime or raises a possible motive for the crime is independently relevant and admissible as evidence." *Morris v. State*, 358 Ark. 455, 459–460, 193 S.W.3d 243, 247 (2004). Mr. Gill questioned several witnesses at trial regarding his demeanor following his wife's death, leaving the State free to explore the degree of his supposed grief through the testimony of his ex-wife about the nature and speed of their rekindled relationship after Ms. Gill's death. The fact that the evidence is harmful or prejudicial to one side or the other does not cause it to be inadmissible. *Boyle v. State*, 363 Ark. 356, 365, 214 S.W.3d 250, 255 (2005) (testimony of woman with whom defendant flirted following the death of his wife was relevant to lack of grief and not overly prejudicial). The probative value of the evidence, whether Mr. Gill was in fact grieving for his deceased wife, far outweighed any unfair prejudice. Additionally, the allegation that Walden's testimony was merely "character assassination" is unfounded: the witness was free to explain that she and Mr. Gill had not spoken for years before she contacted him upon learning of the death. Because Mr. Gill failed to show that he was unfairly prejudiced by Walden's testimony, the trial court did not abuse its discretion by admitting it.

## IV. *Motion for a Mistrial*

At the sentencing phase of trial, Mr. Gill moved for a mistrial during this part of the State's closing argument:

So, if you're not going to send him to jail for the rest of his life, you have to consider giving him the maximum num-

ber of years because, if you don't, what does that say to our community, when you're willing to send a young kid for selling drugs for eighty to ninety years in jail, what would it say?

The court denied the motion for mistrial, stating that it would "do something curative" and would allow defense counsel to help phrase it, without waiving his objection, or the court would "wing it." Counsel renewed his objection. The court instructed the jury to disregard the statement about comparing sentences, and the prosecutor told the jury that he was not trying to give them his personal opinion regarding the appropriate sentence but was asking that they fit Mr. Gill's punishment to the crime.

A mistrial is a drastic remedy, to be employed only when error is so prejudicial that justice cannot be served by continuing the trial, and when it cannot be cured by an instruction to the jury. *Peters v. State*, 357 Ark. 297, 166 S.W.3d 34 (2004). The decision to grant a mistrial is within the sound discretion of the trial court and will not be overturned absent a showing of abuse or manifest prejudice to the appellant. *Id.* In the absence of manifest abuse of discretion, the reviewing court will not reverse a trial court's action in matters pertaining to its control, supervision, and determination of the propriety of arguments of counsel. *Tate v. State*, 367 Ark. 576, 242 S.W.3d 254 (2006). Closing remarks that require reversal are rare and require an appeal to the jurors' passions. *Id.* Generally, such an error may be cured by a remedial instruction from the court, and the trial court is in the best position to evaluate the potential for prejudice based on the prosecutor's remarks. *Id.*

Moreover, a defendant who has received a sentence within the statutory range short of the maximum sentence cannot show prejudice from the sentence. *Id.* After being instructed in this case that the crime carried a sentence up to life imprisonment, the jury sentenced Mr. Gill to forty years' imprisonment. He can show no prejudice because he was given less than the sentence allowed by statute. Thus, his argument fails.

Affirmed.

ROBBINS and HENRY, JJ., agree.